# C. A. TILLES v. PULITZER PUBLISHING · COMPANY, Appellant.

### In Banc, March 28, 1912.

1. **MAJORITY OPINION.** When the Supreme Court by a majority of its judges has spoken, its decision is the judgment of the court.

2. **JURISDICTION: Libel: Place Where Cause Accrues.** The right of a plaintiff, who resides in St. Louis, to bring a suit for libel in St. Louis county against a corporation whose domicile is also in that city, was determined by the case of Julian v. Kansas City Star, 209 Mo. 35; and the decision in that case, to the effect that defendant by asking for a change of venue waived the question of jurisdiction, is held to settle the question.

3. **LIBEL: Pleading: Colloquium: Connecting Plaintiff with Publication.** If the publication is libelous *per se*, there need be, under the statute, no colloquium of extraneous facts for the purpose of showing the application of the defamatory matter to the plaintiff more than that the words were spoken or published of or concerning him. That allegation having been made, the petition need not allege that the plaintiff was either owner, lessee, operator or managing officer of the corporation conducting, permitting and encouraging the bookmaking and pool selling charged to be a felony. And to charge that "these men are engaged in the commission of a felony and the owners of the race track are equally guilty with the bookmakers under the statute," is to charge a libel *per se*.

4. **———: Owners of Corporation: Reference to Plaintiff.** The defendant on June 22nd published in its newspaper an interview with the Attorney-General in which these words were used: "These men are engaged in the commission of a felony, and the owners of the race track are equally guilty with the bookmakers under the statute"—bookmaking being then a felony. The plaintiff had then been in Europe since May 1st. The race track was owned by a corporation, in which plaintiff was a stockholder; and the property itself by two other corporations, in one of which he was a stockholder. During the year he was not in active management of either corporation, but he and two others were recognized as owners, and defendant so recognized them. Before his departure for Europe he and the other two discussed the future running of the race track, and he says the matter was left to them to do as they pleased, and he gave

241 Mo.—39

instructions before leaving to sue defendant if he was libeled by it, and the suit was brought before he saw the publication. *Held*, that the proof shows that the publication refers to plaintiff and the readers thereof so understood it, as three of them who had inside knowledge of the owners testified they so understood it.

5. ————: **Official Investigation of Notorious Crime: Privileged Occasion.** The official investigation by the Governor and Attorney-General of the persistent effort of a race track association to continue bookmaking and poolselling, which have been made a felony by recent statute, and at which 5000 people daily congregated, rises to the dignity of privileged occasion, or at least a quasi-privileged occasion; and where there is threatened legal action by them, the public is entitled to know the reason therefor. A fair publication, made as a matter of news or public concern and without actual malice, of what the Attorney-General says officially and for the public, under such circumstances —for instance, "These men are engaged in the commission of a felony and the owners of the race track are equally guilty with the bookmakers under the statute"—is privileged, and not actionable.

6. ————: **Qualified Privilege: Question for Jury.** If the publication was qualifiedly privileged and the record rebuts the idea of malice, there is no case for the jury. And though the words attributed to the Attorney-General are of themselves libelous *per se*, and though malice is presumed where the words are *per se* actionable, yet if the publication truthfully published the words used by him, who uttered them in his official capacity as information to the public, concerning a matter of great public concern, there is no question for the jury, in the absence of any showing of actual malice; and if there was no showing of express malice and none was found by the jury, although they returned a verdict for compensatory but none for punitive damages, the judgment must be reversed.

*Held*, by WOODSON, J., dissenting, that the court cannot declare the interview of the Attorney-General was in fact his official opinion; that whether or not it was an official opinion was a fact to be determined by the jury, upon the evidence introduced, and not by him; and that, until that fact was established, the opinion, which was oral, was not admissible in evidence.

7. ————: ————: **Malice: Proof.** For a newspaper to advocate a just taxation of the properties of a corporation of which plaintiff was a stockholder, is no evidence of malice toward him.

8. ————: ————: ————: **Enforcing the Law.** To publish what was being done by the officials of the county in the matter

of enforcing the law in reference to bookmaking and pool-selling on the race track owned by the corporation of which plaintiff was a stockholder, is no evidence of express malice towards him, or of a manager thereof.

Appeal from St. Charles Circuit Court.—*Hon. J. D. Barnett,* Judge.

REVERSED.

*Judson & Green* for appellant.

(1) Defendant's plea to the jurisdiction of the trial court should have been sustained. The construction placed upon the Missouri statutes by the lower court renders them unconstitutional and void in denying to the defendant the equal protection of the laws. County v. Railroad, 118 U. S. 394; Railroad v. Ellis, 165 U. S. 150; State v. Ashbrook, 154 Mo. 375; State v. Railroad, 195 Mo. 288; State v. Loomis, 115 Mo. 307; Hammond Co. v. Best, 91 Me. 431. (2) Plaintiff's petition is fatally defective in that it fails to set out enough of the article complained of to enable the court to understand the sense in which the language so set out was used, and the demurrer and motion in arrest should, therefore, have been sustained. Townshend on Libel, sec. 334; Odgers on Libel (4 Ed.), 581; Cartwright v. Wright, 5 B. & A. 615; Rutherford v. Evans, 6 Bingham, 451. There being no matters of "inducement" alleged in the petition—no allegation that plaintiff was in fact either an owner, or a stockholder, or managing officer of the corporation owner—both the petition and the proofs are in this respect fatally defective. Havemeyer v. Fuller, 60 How. Prac. 320; Pub. Co. v. Journal Co., 108 Mo. App. 232; Legg v. Dunleavy, 80 Mo. 558; Crystal v. Craig, 80 Mo. 367; McManus v. Jackson, 28 Mo. 56; Bundy v. Hart, 46 Mo. 460; Kenworthy v. Journal Co., 117 Mo. App. 327; Flowers v. Smith, 214 Mo. 132; Hatfield v. Sisson, 59 N. Y. Supp. 73. (3) It was admitted that the "owner" of the Delmar Race Track was

a corporation. As a corporation must necessarily act through its officers and agents, this article can only mean that those managing officers and agents of the corporation, who were personally in control of said track about the 22d of June, 1905, were, in the opinion of the Attorney-General, guilty of a felony. As it was admitted that plaintiff was in Europe at that time, this article could not have been libelous as to him, if he was not in fact acting as a managing officer, and defendant's demurrer to the evidence should have been sustained. Kenworthy v. Journal Co., 117 Mo. App. 327; Flowers v. Smith, 214 Mo. 132; Girard v. Beech, 3 Smith (N. Y. Rep.), 337; Newell on Slander & Libel (2 Ed.), 258, sec. 21; Crecelius v. Bierman, 59 Mo. App. 513. To publish an article imputing dishonest conduct to a corporation, libels only its actual "managing officers." Pub. Co. v. Journal Co., 108 Mo. App. 232. Plaintiff's case in respect to this fatal defect in his petition and proofs is not aided or strengthened in any way by the illegal testimony of McCarty, Baer and Ray as to what they understood the word "owners," as used in this article, to mean, because each of those witnesses had special or peculiar knowledge upon the subject, which it was not shown that the ordinary reader possessed. Therefore, the fact that the parties, with their special knowledge about the race thack, understood the word "owners" to mean Cella, Adler & Tilles, affords no sort of inference that the ordinary, average reader, without such special knowledge, so understood it. The question here is, how did the ordinary reader understand it? Gribble v. Pub. Co., 37 Minn. 277; Newell on Slander & Libel (2 Ed.), 308, sec. 33; Callahan v. Ingram, 122 Mo. 355; O'Brien v. Bennett, 76 N. Y. Supp. 498; Snell v. Snow, 54 Mass. 278, 13 Met. 278; Anderson v. Hart, 68 Iowa, 400; Van Vetchin v. Hopkins, 5 Johns. 211; Stokes v. Journal, 73 N. Y. Supp. 245. Therefore, plaintiff's instructions are fatally

defective in authorizing the jury to find for plaintiff
if they believed that the article was in fact published
of and concerning plaintiff, without requiring them
to find that the ordinary average reader understood
it to be published of and concerning plaintiff.    (4)
The article was not libelous even if it was understood
by the ordinary reader to refer to plaintiff, because
it merely states an opinion as to the legality or crimi-
nality of a certain system of betting then being openly
conducted at the Delmar Race Track. Where words
relate to certain acts, and merely express an opinion
as to the legal effect of the acts referred to, they are
not libelous, even though they in form impute a crime.
Therefore, it being clear from this article that it
merely expresses the opinion of the Attorney-General
that a certain system of racing and betting thereon
then in actual use at the Delmar Race Track was in
violation of law, and that the persons who permitted
the same to be so conducted had committed a crime, it
was not libelous, and as there was no evidence of bad
faith in making this publication, there was therefore
nothing to submit to a jury.    McGilroy v. Springett,
68 Ill. App. 276; Ayres v. Grider, 15 Ill. 37; Hall v.
Adkins, 59 Mo. 144; Hatfield v. Sisson, 59 N. Y. Supp.
73; Havemeyer v. Fuller, 60 How. Prac. 316; Town-
shend on Libel & Slander, 173, 174; Newell on Libel
(2 Ed.), 569.    (5)    The article was privileged because
it refers to the public acts and the public opinions and
announcements of the public officers of the State upon
a public matter; and it was the duty of the defendant,
as well as of all good citizens, to make those announce-
ments and opinions known to those who were accus-
tomed to attend said track.    It was, therefore, in the
highest degree and in every sense, a privileged occa-
sion, and as there was no evidence of express malice
or actual ill-will, there was nothing to submit to the
jury.    Crane v. Waters, 10 Fed. 689; Weber v. Lane.
99 Mo. App. 69; Barrows v. Bell, 7 Gray, 301; Meri-

wether v. Knapp, 120 Mo. App. 390; Brown v. Print-
ing Co., 213 Mo. 611; 18 Am. and Eng. Ency. Law (2
Ed.), 1046; Albutt v. General Council, 232 B. Div. 400;
McBee v. Fulton, 47 Md. 403; Tresca v. Maddox, 15 Am.
Dec. 214; Usill v. Hales, 3 C. P. D. 319; Usher v. Sever-
ance, 20 Me. 9; Newell on Slander and Libel, p. 549,
sec. 152; Pub. Co. v. Smith, 149 Fed. 706; McClure v.
Pub. Co., 38 Wash. 160.   (6) The Delmar Race Track
was a place of general public resort, to which all the
public were invited.   The announcement of the Gov-
ernor and the opinion of the attorney-general, there-
fore, as to the character of this public place, and as
to the legality of the operations which were publicly
conducted there, and which the general public were
invited to see and participate in, was of general pub-
lic interest and it was the duty of defendant as a pub-
lic journal, for these reasons, to advise its readers
what the opinion of the attorney-general as to its
character was.   The court, therefore, erred in refusing
to give defendant's instructions on the theory of priv-
ilege.   Finley v. Steele, 159 Mo. 299; Newell on Libel
(2 Ed.), 500; Townshend on Libel (4 Ed.), sec. 209;
Eames v. Whitaker, 123 Mass. 342; Landis v. Camp-
bell, 79 Mo. 239; Press Co. v. Stewart, 119 Pa. 584;
Klinck v. Kolby, 46 N. Y. 427; Klos v. Zahorik, 113
Iowa, 161; Cheny v. Leader, 114 Iowa, 298; Bearce v.
Bass, 88 Me. 521; Meriwether v. Knapp, 120 Mo. App.
390; Fair Assn. v. Carmody, 151 Mo. 577; Rabb v.
Trevelyan, 122 La. 174.

   *Bond, Marshall & Bond* for respondent.

   (1)   An untruthful publication charging an of-
fense "in general terms" is libelous *per se*.   An un-
truthful publication is also libelous, though failing
to charge any offense, "if it tends to expose the plain-
tiff to contempt, hatred, scorn, or ridicule."   R. S.
1899, sec. 2259; Nelson v. Musgrave, 10 Mo. 648;

Kimball v. Sass, 12 Mo. 499; Price v. Whitley, 50 Mo. 439; Mitchell v. Bradstreet Co., 116 Mo. 241; Ferguson v. Pub. Co., 72 Mo. App. 465; Minter v. Bradstreet, 174 Mo. 485; Ukman v. Daily Record, 189 Mo. 378; McGinniss v. Knapp, 109 Mo. 131; Jones v. Murray, 167 Mo. 44. "It is not necessary in a complaint for libel to set out the whole of the obnoxious publication in which the libel appears. It will be sufficient to set forth such parts of the libel as the plaintiff relies on." 13 Ency. Pl. and Pr. 48. (2) Any publication which is libelous of itself, without any colloquium or innuendo pointing out its libelous sense and meaning, constitutes a cause of action for actual or general damages, without any evidence of injury other than proof of the publication. R. S. 1899, sec. 635; Sheber v. Wensel, 19 Mo. 513; Caruth v. Richeson, 96 Mo. 189; Crecilius v. Bierman, 59 Mo. App. 522. (3) Where oral evidence is offered to sustain an affirmative defense—as the plea in justification filed in this case—the issue joined in such defense must be submitted to the jury, even if all the evidence is one way; since it is for the jury to say whether or not they believe the witnesses. For a stronger reason must this be done, when there was no substantial evidence offered in support of a plea of justification and positive evidence was adduced in disproof of such plea. Wolff v. Campbell, 110 Mo. 114; Huston v. Tyler, 140 Mo. 252; Gregory v. Chambers, 78 Mo. 294; Dalton v. Poplar Bluff, 173 Mo. 47. (4) "Where the words of the libelous publication apply equally well to more persons than one," all circumstances showing plaintiff was meant, may be given in evidence, also all statements of defendant as to the person meant; also readers of the paper may give evidence as to whom they understood the libel to refer. Fanu v. Malcolmson, 1 H. 668; Odgers on Libel & Slander, 129; Newell on Libel & Slander, 259; Caruth v. Richeson, 95 Mo. 189; Crecilius v. Bierman, 59 Mo. App. 522; Julian v. Star,

209 Mo. 79; Russell v. Kelly, 44 Cal. 641; Van Dugen v. Mail & Exp. Co., 156 N. Y. 376. A plea of justification must be as broad as the defamatory accusation, and where the defamatory charge is general in its nature, the plea must state specifically the acts or offenses of which plaintiff is guilty, or the other facts showing the truth of the charge. A mere assertion that the charge is true is not sufficient. 25 Cyc. Law & Proc., 461; Meriwether v. Knapp, 120 Mo. App. 385; Stark v. Knapp, 160 Mo. 551. (5) In general, privilege is either absolute or conditional. The utterances of members of the legislative body and proceedings in court are absolutely privileged. The right to publish judicial proceedings, or other matters, which the public are entitled to know, is conditionally privileged, and is dependent on the fairness and accuracy of the report. Two questions arise with reference to such a publication: First, is the report published fair and accurate? If so, it is prima facie privileged; if not, verdict for plaintiff. Second, is the report even though fair and accurate, malicious? If so, verdict for plaintiff. Odgers on Libel and Slander, 257; 18 Am. and Eng. Ency. Law, 1023. In the case at bar the libelous publication purported to be the report of oral conversation between the Attorney-General and a newspaper reporter. The record shows that the interview between the Attorney-General and the newspaper reporter was not had in the course of any official duty on the part of the Attorney-General, and that he was not correctly nor accurately quoted in the libelous publication purporting to give his remarks to the reporter. Under no view of the law can it be held that there was anything in the "occasion" of this interview to entitle it to be privileged, nor which justified the publication by appellant of a charge of felony against plaintiff as having been made by the Attorney-General to its reporter in such interview. Such a contention is repugnant both to reason and precedent. (6) Even

if the unofficial statement of the Attorney-General had been fairly and accurately reported in the libelous publication sued on, it would have been no more privileged than a report of a similar statement by any citizen. The fact that the charge that plaintiff was a felon, was made by an office holder to a newspaper reporter, gave the paper no more right to publish it than if the same charge had been made by any other citizen. This of course is true, even if the language had not been distorted and falsely reported in the article published, as the record shows was done. Arnold v. Star, 76 Mo. App. 159; Brown v. Globe-Democrat, 213 Mo. 635; Cooley's Const. Lim. (7 Ed.), 637; Brown v. Knapp & Co., 213 Mo. 655.

GRAVES, J.—Plaintiff, a resident of the city of St. Louis, sued the defendant corporation, likewise domiciled in the city of St. Louis, for libel. The original petition was lodged with the clerk of the circuit court of St. Louis county rather than with the clerk of the circuit court of the city of St. Louis, where both parties were domiciled. Damages were alleged in the sum of $150,000, of which $100,000 were alleged to be actual, and $50,000 exemplary. By the petition it is charged that the defendant publishes the St. Louis Post-Dispatch, a daily newspaper, and had an agent for the distribution of such paper in the county of St. Louis; that it had many subscribers to said paper in said county, and such paper was generally circulated and read in said county and was so circulated and read on June 22, 1905; that the president or chief officer of such corporation could not be found in said county of St. Louis. After these general allegations, the petition then proceeds:

"That on said date, to-wit, 22d day of June, 1905, the defendant caused the following false, malicious, defamatory and libelous articles to be printed and

published in its said newspaper of and concerning this plaintiff, to-wit:

" 'These men,' he said 'are engaged in the commission of an open felony and the owners of the race track are equally guilty with the bookmakers under the statute. The law must be enforced, and we are going to prosecute everybody who violates it.'

"Meaning thereby that plaintiff and others as the owners of a certain race track, known as the Delmar Race Track, were engaged in the commission of an open felony.

"Plaintiff states that said publication above set out was wilful, malicious and false, and by reason thereof has been damaged in his reputation in the sum of one hundred thousand dollars."

The summons appears to have been directed to the sheriff of the city of St. Louis, and there served by delivering a copy thereof at the office of the defendant in the city of St. Louis to the person in charge of said office, the president and other chief officers of such defendant not being found even in the city of St. Louis.

At the September term of the circuit court of the county of St. Louis, the defendant entered a special appearance to challenge the jurisdiction of that court, and by its motion to dismiss did challenge the jurisdiction of that court. The motion is an elaborate one, and was evidently prepared with great care, but the details thereof need not be further stated at this time. Suffice it to now say that the same was overruled and defendant duly preserved its rights, if any, by proper bill of exceptions. After the overruling of this motion going to the jurisdiction, the defendant filed its application for a change of venue, alleging the usual statutory grounds. This application coming on for hearing and the sufficiency thereof being apparently conceded, the record discloses that the parties agreed that the court might send the case to the circuit court

of St. Charles county, and the cause was so transferred without futher pleadings filed.

In the circuit court of St. Charles county the defendant challenged the petition by a demurrer, but this being overruled, it answered over. The cause went to trial upon an amended answer, which thus reads:

"Now comes defendant, the Pulitzer Publishing Company, and files this, its amended answer, to plaintiff's petition, and answering says:

"1. This defendant renews its special plea to the jurisdiction heretofore made in this court and says that this court has no jurisdiction over this defendant in this cause, for the reason that this defendant had no officer or agent in St. Louis county, where this suit was filed, nor did the cause of action sued on accrue in St. Louis county, and that the pretended service of process in this cause was made by the clerk of the St. Louis County Circuit Court sending the petition and summons to the sheriff of the city of St. Louis, and that this defendant made no voluntary appearance in the county of St. Louis, but made a special appearance for that purpose only and filed its special plea to the jurisdiction, and after said plea was overruled, removed said cause to this court by change of venue.

"This defendant says that the St. Louis Post- Dispatch is printed at its office, in the city of St. Louis, and that said paper is printed and distributed to the public in the city of St. Louis before the circulation or distribution of any copies in the county of St. Louis, and defendant says that the cause of action did not accrue in the county of St. Louis, but in the city of St. Louis, and as the circuit court of St. Louis county has no jurisdiction over this defendant, neither has the circuit court of this county.

"Defendant further says that if the statutes of Missouri are construed as warranting the service of process in this cause upon defendant, compelling it to appear in the litigation of plaintiff in the circuit court

of St. Louis county, and in the circuit court of this county, when individual publishers of newspapers can only be sued in the counties of their residence, then said statute so construed is violative of the Constitution of this State and the Constitution of the United States in depriving defendant of the equal protection of the laws.

"Wherefore, defendant asks to be hence dismissed with its costs.

"2. And defendant, further answering plaintiff's petition, admits its incorporation, its publication of the St. Louis Post-Dispatch, the location of its principal office and place of business in the city of St. Louis, and says that its office and place of business there located is its only office and place of business; admits that the words set out in plaintiff's petition, and alleged to have been published in the newspaper of defendant on the 22d day of June, 1905, were so printed and published, but says that said words, so alleged to have been printed and published, were an excerpt from and part of an article published in the news columns of said paper on said date and is wholly unintelligible without reference to the remainder of said article showing the connection and meaning of the words set out in the petition. The defendant denies the innuendo set out in the petition, denies that the publication was wilful, malicious and false, and denies that it was defamatory of plaintiff in any sense and denies that plaintiff has been damaged in the sum named in the petition, or in any sum whatever.

"Wherefore, defendant asks to be hence dismissed with its costs.

"3. Further answering plaintiff's petition, defendant says that it is a corporation under the laws of Missouri, engaged in the publication of a daily newspaper, known as the St. Louis Post-Dispatch. Said paper contains news columns setting forth the current news of the day and matters of public interest. The

Delmar Jockey Club was organized as a corporation on or about January 18, 1901, for the chartered purpose, among other things, of establishing and maintaining a suitable fair grounds and a race track in the city and county of St. Louis, and engaged in pool selling, bookmaking and registering of bets on exhibitions of speed at said race track and premises, as provided by law. Said corporation became the lessee of a certain tract of land known as the Delmar Race Track, lying partly in the city of St. Louis and partly in the county of St. Louis, upon which land there was located a race track, and besides other buildings, erections and improvements, a certain shed or building known as the betting ring shed, for the purpose of having conducted therein pool selling, book making, recording and registering of bets upon contests of speed or powers of endurance between certain horses upon said race track.

"At the time of the organization of said corporation, the laws of the State of Missouri then in force authorized the issuance of licenses by the State Auditor for the selling of pools and making of bets and registering of wagers upon the contest made on a race course or fair ground, under certain restrictions contained in the statute. Under this law authorizing the licensing of bookmaking at race tracks, known as 'Breeders Law,' the Delmar Jockey Club, the lessee of the Delmar Race Track, continued the conduct of races and the registering of bets through licensed bookmakers. The spirit of gambling incited among the masses of the people resulting from this public licensed bookmaking became so prevalent and the demoralization of the public morals became so great that the public opinion of the State, guided by public teachers and preachers of all denominations, demanded the repeal of the Breeders' Law and the prohibition of any form of bookmaking or pool selling on racing in the State. The Post-Dispatch, as a public journalist, ad-

vocated this repeal of the Breeders Law. In response to this demand of public opinion, the General Assembly of the State, against the strenuous efforts of the parties interested in the Delmar Jockey Club and Delmar Race Track, passed an act entitled, 'An Act Prohibiting Bookmaking and Pool Selling, and prescribing a penalty therefor,' which was approved by the Governor, March 21, 1905, and which became a law under the Constitution ninety days after the adjournment of the General Assembly, to-wit, June 16, 1905. Said Anti-Breeders Act is in words as follows (p. 131, Session Acts of 1905):

" 'Be it enacted by the General Assembly of the State of Missouri as follows:

" 'Section 1. That any person who keeps any room, shed, tenement, tent, booth or building, or any part thereof, within this State, and who occupies the same with any book, instrument or device, for the purpose of recording or registering bets or wagers or selling pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or take place within or without this State; or any person who records or registers a bet or wager or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, which is to be made or to take place within or without this State, or, being the owner, lessee, occupant or person in charge of any room, tenement, shed, tent, booth or building or any part thereof, within this State, knowingly permits the same to be used or occupied for any of the purposes herein set forth; or therein keeps, exhibits, uses or employs any device or apparatus for the purpose of recording such bets or wagers, or selling of pools, as hereinabove set forth, or becomes the custodian or depository for hire or privilege of any money for any purpose contrary to the provisions of this section, shall, on conviction, be adjudged guilty of a felony, and shall

be punished by imprisonment in the penitentiary for a term of not less than two or more than five years, or by imprisonment in the county jail for a term of not less than six months nor more than one year, or by a fine of not less than five hundred dollars, or by both such fine and imprisonment.

" 'Section 2. All acts or parts of acts inconsistent with the provisions of this act are hereby repealed.'

"After the passage of this repealing act in March, 1905, and prior to its taking effect on June 16, 1905, the management of the Delmar Jockey Club, through this plaintiff, made public announcements of their intentions to continue the running of races upon said Delmar Race Track after said law went into effect, and with a system of betting thereon designed and purposed to evade the application of said act of the General Assembly, said evasion being effected by the discontinuance of the issuance of tickets by pool sellers or bookmakers and the avoidance of any public registration or recording of bets. It was publicly stated by said management that it was their intention to contest the application of the law to such system.

"Defendant further says that after the 16th day of June, 1905, after the said law had gone into effect, the said Delmar Jockey Club continued the running of races and pools continued to be sold thereon by bookmakers who had theretofore been employed by the Delmar Jockey Club, and substantially the same system of pool selling was continued, except that the issuance of tickets to the betters and public registration of the bets was ostensibly avoided.

"The Honorable Joseph W. Folk, Governor of Missouri, announced his intention to enforce the law prohibiting the selling of pools on horse races and he caused the facts, relating to the continued operation of tracks and pool selling at the Delmar Race Track to be investigated by the Honorable Herbert S. Hadley, Attorney-General of the State, and he, the said

Governor, counseled with the said Attorney-General as to what course should be taken for the enforcement of the laws of the State against the defiant conduct of the Delmar Jockey Club and those responsible for its action.

"Owing to the large number of persons employed by the Delmar Jockey Club in attendance upon said races and in connection with the said pool selling, and the large crowds attending from the county and city of St. Louis inflamed with the passion for gambling under the facilities there afforded, there was a local public spirit developed in that section of St. Louis county hostile to the enforcement of the law. The Governor of the State had announced that he would call out the militia of the State if it was necessary for the enforcement of the law.

"The facts relating to the methods pursued in the Delmar Race Track in the matter of betting upon the horse races after the taking effect of the said act of June 16, 1905, were submitted to the said Attorney-General of the State and carefully considered by him, and he thereupon advised the Governor of the State and made public his conclusions and counsel to the effect that said methods pursued were palpably an evasion of and violative of the said act; and the Attorney-General, deeming it was a matter of public interest that his views and proposed policy in the matter of the enforcement of the law should be known to the public, gave out for publication in the defendant's newspaper, the Post-Dispatch, his conclusions, that not only were the bookmakers and pool sellers chargeable with an offense under the act, but that the owners of the property, allowing or permitting such illegal track business, were themselves equally guilty under the law, and that the offense was made a felony under the express terms of the statute. This opinion of the Attorney-General as to this construction of the act, thus given out for publication, was published in the

St. Louis Post-Dispatch, on Thursday evening, June 22, 1905, in an article giving the facts as to the declarations of the Governor of the State in the matter of the enforcement of the law and also this statement of the opinion of the Attorney-General, thus given out for publication, and being the article wherefrom the sentence, set forth in plaintiff's petition, is taken, which said article is in words as follows:

## " 'TROOPS AT THE TRACK SATURDAY UNLESS GAMBLING STOPS.

" 'Governor Folk Tells Friend Militia Will be Ordered Out at Week End to Stop Law Violation at Delmar.

" 'ASSISTANT ATTORNEY-GENERAL EXAMINES CONDITIONS.

" 'State Officials to Help County Authorities, but Will Take the Initiative if Necessary and Make Wholesale Arrests.

· " 'Governor Folk told friends in St. Louis Wednesday night that militia would be sent to Delmar Track Saturday if gambling continued there at that time. He was asked what the militia could do if they were sent there. He replied that they would probably be refused admission to the track, in which event they would batter down the gates and enter.

" 'It was suggested that there might be some shooting in such event.

" ' "Oh, no," replied the Governor, "not unless the other people shoot first."

" 'He said the soldiers would arrest everybody found in the place if it should become necessary to send them there.

241 Mo.—40

" 'The Governor is spending Thursday in Covington, Ky., and will return to St. Louis at night.

" 'As a result of the conference between Governor Folk and Attorney-General Hadley, John Kennish, one of Mr. Hadley's assistants, will go to St. Louis county Thursday to personally represent the State.

" 'He has instructions to request Sheriff Herpel to swear in a sufficient number of deputies to arrest every bookmaker and proprietor in Delmar, and to continue to make the arrests as long as there is any gambling at the track or on the premises.

" 'It is expected that Mr. Kennish will also make a personal investigation of the violations of the Sunday closing laws by the saloons in St. Louis county and make a full report to the Governor, through the Attorney-General.

" 'Mr. Hadley says that the State officers are prepared to co-operate to the fullest extent with the county officials in the establishment and maintenance of obedience of the law; but if the county officials fail to do what is expected of them the State will not hesitate to take the initiative.

" 'He said Mr. Kennish had the option of ordering the arrest, by the county officials, of bookmakers and proprietors at the track. His action in the matter was left to his discretion.

" ' "These men," he said, "are engaged in the commission of an open felony, and the owners of the race track are equally guilty with the bookmakers under the statute. The law must be enforced, and we are going to prosecute anybody who violates it."

" 'Mr. Hadley received Thursday a formal order from Governor Folk to proceed, in person or by one of his assistants, to St. Louis county to assist the prosecuting attorney in prosecuting and suppressing violations of pool selling and dramshop laws, and to do what was necessary in instructing the prosecutor and sheriff to bring about the result.'

"Defendant says that all the facts stated in said article were true. It is true that the Governor of the State expressed himself in the interview as set forth in said article; that a conference had been had between the Governor and Attorney-General, and that Mr. Kennish, the assistant of the Attorney-General, had been instructed as therein set forth, and that the words complained of in the petition were official statements of the Attorney-General of the State as to what he proposed to do in the enforcement of the law under the instruction from the Governor of the State.

"Defendant says that under the Act of March 21, 1905, bookmaking or pool selling or registering or recording bets upon horse races, or the knowingly permitting property to be used for such purposes by the owners thereof, is declared to be a felony, and the validity and constitutionality of such enactments has since that time been adjudged by the Supreme Court of the State.

"Defendant further says that it was a matter of great public interest affecting the general public, who were invited to patronize the said race track, that the position and intention of the public authorities of the State, including the Attorney-General of the State, with reference to the legality of the business carried on at said race track after the repeal of the Breeders' Law, should be publicly known. Wherefore, defendant says that the said article was highly privileged and that it was the right and duty of the defendant to publish the same; that it was published in good faith, without any malice toward plaintiff or any one, and was not defamatory in any sense and that it was published solely for the purpose of informing the public as to matters in which the public was immediately interested.

"Wherefore, having fully answered, defendant asks to be hence discharged.

"Further answering, defendant says that, irrespective of the privileged character of the said publication, the words set out in the petition and complained of were not defamatory in any sense; that the statement made by the Attorney-General, as published in the defendant's paper, did not accuse the owners of said race track, or any of them, of being felons, but, on the contrary, it merely stated that the acts, which those in charge of the management of said race track were publicly permitting and encouraging on said race track, were violative of the statute, and that they, the said managers, in permitting and encouraging such acts, were themselves violating the statute and subjecting themselves to its penalties, and that the word 'felony' was only used as descriptive of the offense thus committed in the words of the statute, and was only the legal opinion of the Attorney-General as to the legal effect of the business openly conducted with the approval of those in charge of said race track.

"Wherefore, defendant says that the innuendo in said petition is untrue in fact and unfounded in law and that the said article was not defamatory in any sense of plaintiff, and defendant asks to be hence dismissed.

"4.  Defendant further answering says that it is true that after the taking effect of the act known as the repeal of the Breeders' Law, the managers of the Delmar Jockey Club, who were the owners referred to in the said article complained of, did at the Delmar Race Track adopt a scheme for the operation of horse racing, with betting thereon, in the attempted evasion of the said act of the General Assembly prohibiting bookmaking and pool selling; that said scheme of attempted evasion of said act consisted in dispensing with the issue of tickets by the bookmakers to the parties making bets, and in the adopting of a system of identification of the betting parties by numbers on badges given to all parties entering the race track, and through a system of recording the bets by ciphers,

letters or marks on slips or sheets used for that pur-
pose by the bookmakers or their clerks. Defendant
says that this system was violative of the spirit and
letter of the act prohibiting bookmaking and pool sell-
ing, and that under said act for the owner or lessee of
a race track to knowingly permit the premises to be
used for such purposes, was declared a felony.

"Defendant further says that the lessee operat-
ing the Delmar Race Track was a corporation, the
Delmar Jockey Club, and that the managers of said
corporation who knowingly permitted such violation
of the law were amenable to its penalties. That this
system of evasion and violation of said act was openly
carried on on said race track after the repeal of the
Breeders' Law, by this plaintiff as one of managing
officers of said corporation.

"Wherefore, defendant says that the statement
of the Attorney-General which was published in said
paper of defendant and is complained of in the peti-
tion, was true."

The reply denied the several defenses in the an-
swer contained. The trial resulted in favor of the
plaintiff and a jury returned a verdict in his favor for
$25,000, as compensatory damages. No punitive dam-
ages were awarded.

. Of this verdict, so far as the record shows, the
plaintiff voluntarily remitted the sum of $12,500, and
judgment was rendered against the defendant for the
remainder, i. e., $12,500.

Motions for new trial and in arrest of judgment
proving unsuccessful, the defendant in due form and
time appealed to this court. Points made will be noted
in the course of the opinion.

I. The first point made in the brief for appellant
is the one going to the action of the circuit court in
disallowing its plea to the jurisdiction. Several au-
thorities are cited in support of the proposition. The

original motion going to the jurisdiction is elaborate, and well and carefully worded. Special appearance is preserved in the motion. At all times thereafter the defendant undertook to assert the want of jurisdiction. The question was preserved in the answer after the overruling of the motion. This question, however, has been so recently gone over by this court in the case of Julian v. Kansas City Star, 209 Mo. 35, that it would be useless to rediscuss the question here. The individual views of the writter and of LAMM, J., are expressed in the dissenting opinion in the Julian case. Those views, however, are not the views of the court. The principal majority opinion in the Julian case, as well as the minority opinion, left a fair Federal question, which Federal question is again urged here. By a separate concurring opinion in the Julian case, a State question, finally determining the case, was injected. That question was the waiver of jurisdiction over the person by reason of filing an application for change of venue. Upon this particular question, our court stood four to three. It was a State question, and operated to obviate a discussion of the real question discussed in the Julian case, when such case reached the Supreme Court of the United States. What that court may have thought of the real issue in the Julian case, must, by reason of the injection of this State question in that opinion, remain as a sealed book. [30 Sup. Court Rep., p. 406.]

A reading of the memoranda opinion by the United States Court, supra, shows that a discussion of the real question in the Julian case, and the real question of jurisdiction urged in this case, was obviated by the State question aforesaid, discussed in the concurring opinion in the Julian case. The same question of waiver is in the case at bar. The United States Supreme Court has decided that this State question is sufficient to preclude that court from a review of the Federal question. The position of this court on the

question of waiver is fixed in the Julian case, so that with these opinions nothing is now left for defendant as to this contention, whatever may be the view of the individual judges. When the court, by majority, has spoken, such is the judgment of the court. This point is therefore ruled against defendant.

II. The second contention of the defendant is that the petition is fatally defective in that it fails to set out enough of the article complained of to enable the court to understand the sense in which the language set out was used. We have set out the whole of that part of the petition bearing upon this point in the statement. Plaintiff says his petition is sufficient under section 635, Revised Statutes 1899 (now Sec. 1837, R. S. 1909). This section reads:

"In an action for libel or slander it shall not be necessary to state in the petition any extrinsic facts, for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose, but it shall be sufficient to state, generally, that the same was published or spoken concerning the plaintiff; and if such allegation be not controverted in the answer, it shall not be necessary to prove it on the trial; in other cases it shall be necessary."

Defendant couches his objection to the petition in this language: "It contains no introductory averments of any matters of fact showing plaintiff's relation to the Delmar Race Track; that is, it contains no allegation that he was either an owner, a lessee, an operator or managing officer of the corporation owning the race track, or that he was a stockholder in the corporation owner. There being, therefore, no preliminary matter of inducement pleaded in the case, and, the language set out in the petition containing no direct reference to plaintiff, by name or otherwise, the innuendo which plaintiff has included in his petition

for the purpose of applying the alleged libelous language to the plaintiff is insufficient for that purpose."

, We are not impressed with this contention in view of the statute, supra. In the language of the statute it is not "necessary to state in the petition any extrinsic facts for the purpose of showing the application to the plaintiff of the defamatory matter out of which the cause of action arose." In other words there need be no colloquium of extrinsic facts for the purpose of showing the application of the defamatory matter to the plaintiff more than that the words were spoken or published of and concerning him.

In the early case of Curry v. Collins, 37 Mo. l. c. 328, this court said: "Since the statute (R. S. 1855, p. 1240, sec. 55) there need be no colloquium of extrinsic facts for the purpose of showing the application of the defamatory matter to the plaintiff, more than that the words were spoken of and concerning him. [Stieber v. Wensel, 19 Mo. 513.] And when the slanderous words are actionable in themselves, it is not necessary to make any prefatory averments as to the circumstances to which they refer; but if the words do not per se convey the meaning which the plaintiff would assign to them, the petition must contain a statement of the extrinsic matter necessary to show that they are actionable, and what is necessary to be stated must be proved."

The words charged to have been published in this case are actionable per se. To whomsoever they referred, they charged such party with being guilty of a felony, an indictable offense. Under our statute it was not necessary to aver that the plaintiff was owner or manager of the Delmar Race Track, and thus identify him as the party referred to in the language quoted. It is sufficient to aver that the language published "was pubished . . . concerning the plaintiff." It thus became necessary for the plaintiff to show by competent evidence that the language "was

published . . . concerning the plaintiff.'' This statute materially changed the verbiage of pleadings in libel and slander cases, and was expressly passed for that purpose. If the words were not actionable *per se* then the rule as to pleading extrinsic matter might be different. [Legg v. Dunleavy, 80 Mo. l. c. 563.]

The question of proof should not be intermingled with the question of pleading. The point here made attacks the pleading only. As to this point, we think the contention of defendant is not well taken and it is therefore so ruled.

III. Defendant further urges that the proof fails to show that the plaintiff was libeled, even though it be conceded that the article was libelous, and not privileged. This contention is based upon the admitted facts that the real owner of the Delmar Race Track was a corporation, and that the defendant although a stockholder in the corporation was not in the active management thereof at the time of the publication. The situation was this: The race track was run by the Delmar Jockey Club as lessee. In this corporation, plaintiff was a stockholder. The property itself was owned by two other corporations. Plaintiff, Tilles, was interested in one of these corporations, but not in the other. During the year 1905, he was not actively managing the Delmar Jockey Club. May 1, 1905, he left for Europe and remained there some six months. At the date of the publication he was in Europe and of course was not in the personal active management of the corporation which conducted the race track mentioned in the pleadings.

Arraying these facts, the defendant charges that there has been a failure of proof in this case, and its demurrer to the evidence ought to have been sustained. The contention is concisely couched in this language: ''It was admitted that the 'owner' of the Delmar Race Track was a corporation. As a corporation must nec-

essarily act through its officers and agents, this arti-
cle can only mean that those managing officers and
agents of the corporation, who were personally in
control of said track about the 22d day of June, 1905,
were, in the opinion of the Attorney-General, guilty
of a felony. As it was admitted that plaintiff was
in Europe at that time, this article could not have
been libelous as to him, if he was not in fact acting
as a managing officer, and defendant's demurrer to
the evidence should have been sustained.''

Another bit of testimony should be mentioned.
Plaintiff says that before leaving for Europe, and af-
ter the passage of the law which repealed the Breeders'
Act, mentioned in the pleadings, he and his copartners,
Adler and Cella, had discussed the matter as to the
further running of the race track. He further says
that the matter was left to them to do as they pleased.
In fact, the general tenor of plaintiff's evidence dis-
closes that he was not actively managing the busi-
ness of the corporation lessee of the race track. On
the other hand it shows that he had but little to do
with it during the year 1905 up to May 1st, and noth-
ing to do with it from that time or until long after
the publication of the article involved in this contro-
versy. About the only thing left behind him at the
time of his departure, in which he seems to have re-
tained an active interest, was the bringing of a libel
suit against defendant, for he says he left instruc-
tions to sue defendant if he was libeled by it, during
his absence, and the suit in this case was filed before
plaintiff had seen a copy of the paper, or even heard
of the alleged libel. A friend, also in Europe, showed
him a copy some days after the suit was filed. His al-
leged injured feelings were therefore an afterbirth.
To sustain the issues upon his part, the plaintiff by
the examination and cross-examination of three wit-
nesses undertook to prove that they understood the
word ''owners'' as used in the article to mean Cella,

Adler and Tilles. (These witnesses possessed special information. That is, they were possessed of infor- mation not possessed by the general public or by the general reader, and for that reason were more readily able to say that they understood the article to refer to Cella, Adler and Tilles. There is but little evidence tending to show that the general reader did so under- stand the word "owner.") Upon these facts the ques- tions arise, does the proof show that (1) the article in fact referred to Tilles, who was not in the active management of the business, and (2) did the readers of this paper so understand that it did so refer.

Whilst it is true plaintiff, Tilles, was not actively engaged in the management of the corporation at the time, yet we think that in law he was a co-manager, even under the talk had with his copartners just prior to his departure for Europe. The defendant paper had upon numerous occasions published that Cella, Adler and Tilles were the owners of this race track, and as a matter of fact they owned practically all of the stock in the Delmar Jockey Club. We think that as such manager he was included within the term "own- ers." Especially is this true in view of the fact that the defendant had continuously recognized him as an owner. By this we do not mean that every stockholder of a corporation could sue when a newspaper said that the owners were guilty of a felony. There is a broad distinction between a mere stockholder and a manag- ing officer. We are further impressed that, taking all the evidence together, it tends to show that the gen- eral reader would understand that the word "owners" referred to Cella, Adler and Tilles, and therefore to the plaintiff as one of such firm. This point we rule against the defendant.

IV. Defendant contends that the matter published is privileged. It is urged that action was being taken by both the executive and legal departments of the

State against the conduct of the Delmar Jockey Club. That the whole matter was of extreme public interest and for that reason the defendant was justified in publishing what the Governor and Attorney-General said about the situation. To our mind there is much substance in this contention. The law under which the plaintiff and others, through the corporate entity of the Delmar Jockey Club, had been acting, had been repealed. Its repeal was effective June 16, 1905. It would seem that the Delmar Jockey Club was loath to give up the privileges and emoluments theretofore enjoyed. The situation had become so acute that the the Governor of the State had publicly indicated that the militia of the State would be used to suppress gambling, if such existed at the Delmar Race Track. Not only so, but the Governor had called upon the Attorney-General and held conference with him as to the enforcement of the law. It was upon an occasion of this kind that the article was published. The article truthfully represents the expression of the Governor and also the expressions of the Attorney-General. Some quibble is made that the language quoted from Attorney-General Hadley is not his language, but the evidence shows that it is substantially reported as by that official stated. The evidence discloses that the place at the race track would accommodate five thousand or more people and that it was generally filled. These visitors no doubt were from all parts of the State, as well as from other States.

The Governor of the State had investigated the facts and the Attorney-General and his assistant had likewise investigated the same. Conferences between these officials were being held, and contemplated action was pending. The public press had been for some time discussing conditions at Delmar Race Track. If the law was being violated, and gambling permitted, the public had an interest in knowing the facts. If contemplated action of any kind affecting this place

of public amusement was about to be taken the public was entitled to know of such contemplated action. The whole situation is so well described by Attorney-General Hadley in his testimony in this case, that at the expense of length to the opinion we quote much of his evidence. He said:

"Q. General Hadley, you are familiar, I suppose, with the act of the General Assembly known as the Anti-Breeders Law, prohibiting bookmaking and prescribing a penalty therefor, reported in the statutes, approved March 21, 1905, and reported on page 131 of the Session Acts of 1905? A. I am.

"Q. You personally prepared that act, did you not? A. Well, I helped certain members of the Legislature to put the bill in the form in which it was finally enacted, and advised with them as to the form in which it should be drafted.

"Q. Were you consulted by the Honorable Joseph W. Folk, Governor of Missouri, after this act took effect in June, 1905, as to the reported violations of that act? A. Yes, sir.

"Q. Was Mr. Kennish connected with that conference and with any proceedings resulting therefrom? A. Yes, sir; that is my recollection that he was both present at the conference, and also acted in his official capacity in reference to the investigation of alleged violations for the purpose of instituting and assisting in prosecutions.

"Q. Now, was any report of the condition under which racing and betting were conducted at the Delmar Race Track submitted to yourself and Governor Folk?

"Q. I ask you as to the fact whether such reports were submitted? A. I was advised and from what was said I would judge that Governor Folk was advised of the conditions by newspaper reports, and, also, in my case by personal conversation with those who said they had been present at the Delmar Race Track

and had seen the method in which bookmaking was carried on.

"Q. Were you advised of the fact that the delivery of tickets to the parties making bets had been discontinued? A. Yes, sir: I had informed myself as to the method in which the bookmaking, or alleged bookmaking, was being conducted.

"Q. Did you give any opinion to the Governor of the State in the matter, in response to a request from him for your opinion? A. I do not now recall whether I gave any written opinion to Governor Folk. I distinctly recollect having expressed to him an opinion in our several conferences, as to what I thought was the illegality of the methods adopted.

"Q. I now call your attention to an interview reported in the St. Louis Post-Dispatch, the paper of Thursday evening, June 22, 1905, do you recall any interview with a Post-Dispatch reporter about or prior to that date? A. Why, I recall that I had a number of interviews with different reporters for the Post-Dispatch and other St. Louis papers during that period in which this matter was being actively considered and handled by the State authorities and the county authorities. As to the interview in question, I also recall a conversation with a party who said he was a reporter for the Post-Dispatch in reference to it, in reference to the matter.

"Q. Do you remember who the reporter was? A. I do not; my recollection is that I had never seen him before.

"Q. You don't remember whether it was Mr. McAuliffe, the gentleman here? A. My recollection is that it was not Mr. McAuliffe.

"Q. I call your attention to this statement in the article, preceding the reported interview with yourself: 'As a result of a conference between Governor Folk and Attorney-General Hadley, John Kennish, one of Mr. Hadley's assistants, will go to St. Louis

county Thursday to personally represent the State. He has instructions to request Sheriff Herpel to swear in a sufficient number of deputies to arrest every book-maker and proprietor in Delmar, and to continue mak-ing the arrests as long as there is any gambling at the track or on the premises. It is expected that Mr. Ken-nish will also make a personal investigation of the vio-lations of the Sunday closing law by the saloons in St. Louis county, and make a full report to the Governor through the Attorney-General.' Now, are the facts stated therein as to the instructions to Mr. Kennish as a result of the conference between Governor Folk and yourself and Mr. Kennish, correct?    A.    I think some of that which you read to me would be inferences or conclusions of the writer of the article and others would be a correct statement of fact.    Mr. Kennish was directed to go to St. Louis county and confer with the authorities there, and to ascertain what was in reality being done and to report.    That, my recollec-tion is, was the only purpose of his visit upon the first occasion, and the reason why he went there.    But he did go there at my direction, at the request of the Gov-ernor, to ascertain what was being done, with the idea of taking action upon it; and I wish to say in that con-nection, as explanatory, that I was here in St. Louis at the time taking testimony before Judge Anthony in the Standard Oil case, and I was the only one that was entirely familiar with the testimony to be intro-duced.    Mr. Kennish went in place of myself.

"Q.    Did Mr. Kennish go personally to the Del-mar Race Track?    A.    My recollection is that he did not, although I may be mistaken in that.

"Q.    How did he investigate it?    Whether he ever went to the race track, I do not know; he went to St. Louis county on several occasions for the purposes that I have stated.

"Q.    Did you instruct him to go there to partici-pate in the prosecution of parties who were arrested

and prosecuted for violation of the Anti-Breeders Law? A. Both Mr. Kennish and myself went subsequently to assist in the trial of the accused men on the charge of bookmaking.

"Q. Now I. will call your attention to a reported interview with yourself, which I will read to you:

" 'Mr Hadley says that the State officers are prepared to co-operate to the fullest extent with the county officers in the establishment and maintenance of obedience to the law; but if the county officials fail to do what is expected of them the State will not hesitate to take the initiative.

" 'He says that Mr. Kennish had the option of ordering the arrest, by county officials, of bookmakers and proprietors at the track. His action in the matter was left to his discretion.

" ' "These men," he said'—that is, referring to you—' "are engaged in the commission of an open felony, and the owners of the race track are equally guilty with the bookmakers under the statute. The law must be enforced, and we are going to prosecute everybody who violates it." '

"Now, calling your attention to the words— you have already stated you did have a conversation with the reporter for the paper about that? A. Yes, sir.

"Q. About that time when the subject was discussed? A. Yes, sir.

"Q. I call your attention particularly to this language: ' "These men" he said, "are engaged in the commission of an open felony, and the owners of the race track are equally guilty with the bookmakers under the statute." ' To that specific language quoted; did you or did you not use that language to the reporter? A. I do not know that I used those specific words; my recollection would be that I did not use those specific words, *but I said in substance what I am quoted as saying.*

"Q. I call your attention particularly to the statement that 'these men are engaged in the commission of an open felony;' state whether or not you used those words? A. I think I did not use the word 'open;' I think I used the words 'they are committing a felony.' The words 'open felony' would not be a legal term, and consequently I think I did not use it, but I think I did make a statement to the reporter in answer to an inquiry from him as to the criminal responsibility of the owners of the track who were permitting bookmaking to be done there, and in answer to such an inquiry I said that they were equally guilty with those who were doing the bookmaking, and made guilty by the same act.

"Q. That statement was made by you for publication, was it not? A. It was made in answer to the inquiry, and I understood of course that what I said to him would be embodied in a newspaper article, or would be stated as an interview. Of course, I did not mean to say that I sought the interview and desired to make any statement. I recollect the reporter coming to me and asking me some questions which called for a statement for my opinion as to the criminal responsibility of the various parties concerned in the bookmaking, and I gave him what was my opinion.

"Q. *Now this opinion was given by you for publication, after you had examined the act?* A. Oh, yes.

"Q. *And after you had had those conferences with the Governor of the State?* A. That would be my recollection, although I will say that I had several conferences with the Governor, both before I came to St. Louis and after I came here; and he was here on one or two occasions. Whether it followed the conference here in St. Louis or not, would be a question on which my recollection would not be sufficiently clear to make a statement that I would be satisfied with.

. . . "Q. Now General Hadley, in making this statement to the reporter of your opinion as to the legal responsibility of all the parties concerned in what you found was a violation of that statute, did or did you not deem that it was a matter of public interest and to so state it, that it was your duty to  have and to give an opinion to the public? A.  I had an occasion to form an opinion in this matter in order to advise the Governor of the State in my official capactiy, and I answered the inquiry of the reporter because I believed in this instance, and in other cases, that it was of interest to the public what was being done by the public officials, and that the public has within reasonable limits the right to know about it.

"Q. You felt that this was a case in which the public had an interest in knowing your opinion about the matter? A.  I had assumed so from the prominence given it in the news columns of the local papers, and from the fact that I was asked as to my opinion by a representative of the papers, by representatives of the papers."

Under the law it is the duty of the State's Chief Executive to see that the laws of the State are enforced.  To this end he has the right to call upon the chief law officer of the State.  Both have the right to investigate the facts, and both have, in their respective spheres, the right to act.  Under the evidence in this case there had been an official investigation.  Such investigation rises to the dignity of a privileged occasion, or at least a quasi-privileged occasion.  There was threatened action upon the part of the Chief Executive and the chief law officer of  the State.  And all this, too, after an investigation.  The reason for such threatened action the public was entitled to know, to the end that those who did not desire to be present when wholesale arrests were made, or the militia was called into service might keep away from the place. The Attorney-General in the close of his testimony

said that he was speaking officially and intended that his opinion should be made public, on account of the public interest which was to be subserved. He was in fact expressing his opinion as to the condition and legal status of the Delmar Jockey Club and the acts of such club and its owners.

Under these circumstances, we think that there was a privilege or at least a qualified privilege in the publication of the article containing this opinion of the chief law officer of the State. Of course, such publication would have to be fair and without malice. As said by COCKBURN, C. J., in Watson v. Walters, L. R. 4 Queen's Bench, l. c. 86:

"It is now well established that faithful and fair reports of the proceedings of courts of justice, though the character of individuals may incidentally suffer, are privileged, and that for the publication of such reports the publishers are neither criminally nor civilly responsible.

"The immunity thus afforded in respect of the publication of the proceedings of courts of justice rests upon a twofold ground. In the English law of libel, malice is said to be the gist of an action for defamation. And though it is true that by malice, as necessary to give a cause of action in respect of a defamatory statement, legal, and not actual malice is meant, while by legal malice, as explained by BAYLEY, J., in Bromage v. Prosser, 4 B. & C. 255 (E. C. L. R., vol. 10), is meant no more than the wrongful intention which the law always presumes as accompanying a wrongful act without any proof of malice in fact, yet the presumption of law may be rebutted by the circumstances under which the defamatory matter has been uttered or published, and, if this should be the case, though the character of the party concerned may have suffered, no right of action will arise. 'The rule,' says Lord CAMPBELL, C. J., in the case of Taylor v. Hawkins, 16 Q. B. 321 (E. C. L. R., vol. 71), 20 L. J.

Q. B. 314, 'is that, if the occasion be such that repels the presumption of malice, the communication is privileged, and the plaintiff must then, if he can, give evidence of malice.'

"It is thus that in the case of reports of proceedings of courts of justice, though individuals may occasionally suffer from them, yet, as they are published without any reference to the individuals concerned, but solely to afford information to the public and for the benefit of society, the presumption of malice is rebutted, and such publications are held to be privileged.

"*The other and the broader principle on which this exception to the general law of libel is founded is, that the advantage to the community from publicity being given to the proceedings of courts of justice is so great, that the occasional inconvenience to individuals arising from it must yield to the general good.* It is true that with a view to distinguish the publication of proceedings in Parliament from that of proceedings of courts of justice, it has been said that the immunity accorded to the reports of the proceedings of courts of justice is grounded on the fact of the courts being open to the public, while the houses of Parliament are not; as also that by the publication of the proceedings of the courts the people obtain a knowledge of the law by which their dealings and conduct are to be regulated.    But in our opinion the true ground is that given by LAWRENCE, J., in Rex v. Wright, 8 T. R. 298, namely, that though the publication of such proceedings may be to the disadvantage to the particular individual concerned, yet it is of vast importance to the public that the proceedings of courts of justice should be universally known. The general advantage to the country in having these proceedings made public more than counterbalances the inconvenience to the private persons whose conduct may be the subject of such proceedings.' In Davison v. Duncan,

7 E. & B. 231 (E. C. L. R., vol. 90), 26 L. J. Q. B. 106, Lord CAMPBELL says: 'A fair account of what takes place in a court of justice is privileged. The reason is, that the balance of public benefit from publicity is great. It is of great consequence that the public should know what takes place in court; and the proceedings are under the control of the judges. The inconvenience, therefore, arising from the chance of injury to private character is infinitesimally small as compared to the convenience of publicity.' And WIGHTMAN, J., says: 'The only foundation of the exception is the superior benefit of the publicity of judicial proceedings which counterbalances the injury to individuals, though that at times may be great.'

"Both the principles, on which the exemption from legal consequences is thus extended to the publication of the proceedings of courts of justice, appear to us to be applicable to the case before us. *The presumption of malice is negatived in the one case as in the other by the fact that the publication has in view the instruction and advantage of the public, and has no particular reference to the party concerned.* There is also in the one case as in the other a preponderance of general good over partial and occasional evil. We entirely concur with LAWRENCE, J., in Rex v. Wright, 8 T. R. 298, that the same reasons which apply to the reports of proceedings in courts of justice apply also to proceedings in Parliament."

One of our courts has extended the privilege to the acts, and the reasons for the acts, of important public officials. In Bank v. Goodwin, 148 Mo. App. l. c. 374, GOODE, J., says:

"It is urged for defendants the words charged cannot be regarded as a libel, because they were the statements of a reason, whether a statutory one or not, why the Postmaster General issued a fraud order against plaintiff. On the face of the petition it is ambiguous whether the publication intended to say the

Postmaster General had assigned such a reason for his order, or the defendants were undertaking to explain the issue of the order by imputing reasons to the Postmaster General. If that official gave no such reason, then defendants are liable unless they can prove the truth of the charge. The question of difficulty is whether or not, if the Postmaster General did assign the published matter as a reason for his action, this clothes said matter with a quasi-privilege, so defendants are not liable unless they published from express malice. Authorities on this question are meager and perhaps not harmonious. The Postmaster General is a high official of the National Government and his acts are such as are of interest to the general public. We simply say that in our judgment a fair publication, made as matter of news or public concern and without actual malice, of what such an officer does officially and the reasons he gives for his acts, should be privileged, and we hold it is upon persuasive authorities, though we find none on either side of the question in this State. [McClure v. Pub. Co., 38 Wash. 160; Meteye v. Times-Democrat Publishing Company, 47 La. 824; Wason v. Walter, L. R. 4 Q. B. 73; Conner v. Publishing Co., 183 Mass. 475; 25 Cyc. 410, and cases cited in notes.] In said treatise the rule is thus stated: 'An accurate and impartial account of executive or legislative proceedings and investigations is privileged when made in good faith.' That ought to be the law, considering the widely diffused interest among the people in what great officers of the government do in their official capacity, and the beneficial influence on the conduct of public affairs of disseminating information on the subject. We do not see why the public is not entitled to be informed the Postmaster General has issued a fraud order against some persons or company and of the reasons assigned for doing so, but think no one will be harmed and many perhaps helped, on the whole, by publishing the facts."

The cases cited by Judge Goode fully sustain the views expressed by him.

The next question is, was there malice shown in the publication of the article?

Primarily where the words used are actionable *per se* malice is presumed, but this, like all other presumptions which take the place of evidence, is a rebuttable presumption, and the presumption may be conclusively destroyed by the facts and circumstances. In the case at bar the jury in effect found that there was no express malice. The jury refused to find punitive damages, thus indicating that the jury was satisfied that there was no evidence of express malice. All the facts tend to show that this article was published in good faith as a matter of public concern, and it was a matter of great public concern.

Practically all the evidence shows that there was no malice towards this plaintiff in the publication of the article. The plaintiff in an effort to show express malice introduced certain previous publications from defendant's paper. Even though from the words taken alone there was raised the presumption, presumptions of this class disappear upon appearance of evidence.

If the article was qualifiedly privileged and if the record rebut the idea of malice then there was no case for the jury. The Court in Banc has but recently so announced. In Diener v. Star Chronicle Pub. Co., 230 Mo. l. c. 621, we said:

'"So, if the petition be not challenged by way of demurrer *in limine,* and the case be fully developed on trial, and if under the pleadings and evidence no case is made, the court may take the case from the jury by a peremptory instruction in the nature of a demurrer. So far as above indicated, libel suits, though *sui generis* (in a sense) are subject to those rules of practice found wise and useful in administering justice generally in the courts.

"The propositions just ruled lie well within the holding and reasoning of Heller v. Pulitzer Pub. Co., 153 Mo. 205; Ukman v. Daily Record Co., 189 Mo. l. c. 390, and the fourth proposition discussed in the Ukman case, 189 Mo. l. c. 393, *et seq.,* and cases and textbooks cited; Branch v. Knapp & Co., 222 Mo. 587-588; Banks v. Henty, L. R. 7 App. Cas. (H. L.) 741. And the student in jurisprudence, curious in that behalf, may find in those cases and authorities the reasoning supporting those propositions."

There were other articles from the same paper introduced in evidence. In some it was shown that the Post-Dispatch was instrumental in having the property of those corporations taxed. It was valuable property and formerly belonged to the St. Louis Fair Association. By statute it was exempted, although the racing business overshadowed the agricultural fair feature. It practically became private property when sold to the Cella, Adler and Tilles corporation by the St. Louis Fair Association. For a paper to advocate a just distribution of taxation is no evidence of malice toward a mere stockholder in one of the corporate owners. For a paper to say that corporate property should be taxed is no evidence of malice toward a mere stockholder. In other articles the paper published what was being done by the officials of St. Louis county toward enforcing the law of 1905 which prohibited bookmaking. These articles are not evidence of express malice toward a mere stockholder or even manager of a corporation.

Other evidence as to express malice does not rise higher than the above.

So we say, taken as a whole, the evidence fails to show malice toward the plaintiff, Tilles, and if the article is privileged, as we think, there is no liabilty and the trial court should have so instructed the jury.

V. There are, to our minds, numerous errors in the trial which would authorize a reversal and remanding of the cause, but entertaining the views which we do on the last proposition discussed, we have confined the discussion to questions which go solely to a final disposition of the case here.

From what we have said the judgment should be reversed without remanding the cause and such will be the order.

PER CURIAM.—The foregoing opinion of GRAVES, P. J., in Division Number One, is hereby adopted as the opinion of this court. All concur, except *Woodson, J.*, who dissents in opinion filed.

DISSENTING OPINION.

WOODSON, J.—I dissent from paragraph four of the opinion delivered in this case for the reason that I do not think that the court can declare as a matter of law that the interview of General Hadley, published by appellant, which constitutes the libelous charge complained of, was in fact the official opinion of the Attorney-General.

That was a fact to be determined by the jury, upon the evidence introduced, and not by the Attorney-General himself; and until that fact was established, the opinion, which was oral, was not admissible in evidence, much less the interview purporting to give to the press the substance of the opinion.

This is elementary and needs no authority to support it.

The fact that General Hadley was introduced as a witness, and testified that the interview was the substance of his opinion, does not alter the rule just stated; nor is that rule changed by the fact that there was no other evidence introduced upon the subject. Still it was a question for the jury. [Rinehart v. Railroad, 204 Mo. l. c. 276; Milliken v. Commission Co., 202 Mo. l. c. 655.]

Nor was respondent bound by the statement of any one of his witnesses in the case. [Helling v. United Order, 29 Mo. App. 309; Spurgin v. Frick, 73 Mo. App. 128; Brown v. Wood, 19 Mo. 475.]

I, therefore, dissent from the result reached in the opinion.