**Sandra K. HYDE, Appellant,**

v.

**CITY OF COLUMBIA, Missouri; Nate Brown, Tribune Publishing Co., d/b/a Columbia Daily Tribune: Walter Potter, Missourian Publishing Assn., Inc. d/b/a Columbia Missourian, Respondents.**

**No. WD 32406.**

Missouri Court of Appeals,
Western District.

June 15, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Aug. 3, 1982.

Applications to Transfer Denied Sept. 13, 1982.

Fred Dannov, Columbia, for appellant.

Terence C. Porter, Columbia, for Nate Brown & Tribune Pub. Co.

Hamp Ford, Knight, Ford, Wright, Atwell & Parshall, Columbia, for City of Columbia, Mo.

Before SHANGLER, P. J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The plaintiff Hyde sued the City of Columbia for the negligent disclosure of her name and address by the city police to reporter Brown of the Columbia Daily Tribune and to reporter Potter of the Columbia Missourian and for the negligent publication of that information subsequently by the newspapers. The petition alleges that on August 20, 1980, after midnight, the plaintiff was abducted and kidnapped by an unknown male assailant but escaped from his car; that she made a full report of that incident to the City of Columbia Police Department; that on that date, the police, without knowledge or authority of the plaintiff, released her name and address to the reporters for publication when the police knew the assailant was still at large; that on that very day the Columbia Daily Tribune published that information and on the next day, August 21, 1980, the Columbia Missourian published that information with the knowledge that the assailant was not in custody. The petition then alleges that the release and publication of her name and address identified the plaintiff to the unknown assailant who thereafter terrorized her on seven different occasions. The petition joined the reporters Brown and Potter, the newspapers Columbia Daily Tribune and Columbia Missourian and the City of Columbia as defendants. The prayer was for actual damages.

The several defendants moved to dismiss the petition on the general ground that the allegations failed to state a claim for relief. The memorandum of reporter Brown and newspaper Columbia Daily Tribune explicated the grounds more specifically: "The plaintiff's petition fails to state a claim against these defendants either as an action for libel, or for the invasion of privacy." The memorandum of the defendant City of Columbia explicated the petition amounted to neither a claim of outrageous conduct nor of an invasion of privacy and that the information disclosed to the press was, in any event, a public record under §§ 610.010 and 610.025, so the disclosure was not actionable. The motions were sustained and the court dismissed the petition with prejudice. The plaintiff appeals the judgment, but only as to the defendants City of Columbia, reporter Brown and newspaper Columbia Daily Tribune.[1]

A petition suffices as against a motion to dismiss if the averments, when accorded every reasonable intendment, invoke a substantive remedy. *Williamson's Estate v. Williamson*, 380 S.W.2d 333, 338 [8–10] (Mo.1964). The pleader need only allege a state of ultimate facts which show the petitioner is entitled to relief and demands such a judgment. Rule 55.05; *Sutton v. Sutton*, 567 S.W.2d 147[1–3] (Mo.App. 1978). The facts asserted in the affidavit of a party [as by response to an interrogatory][2] are competent to interstice and sup-

1. The motion to dismiss of the defendants, reporter Potter and newspaper Columbia Missourian, does not appear in the record on appeal. That these defendants did move dismissal is evident from the transcript of the hearing on the motions to dismiss. The arguments of counsel and discussions *inter sese* disclosed that the answers made by the plaintiff to interrogatories by the defendants Potter and Columbia Missourian showed that the unknown assailant called and harassed the plaintiff twice [presumably on the day of the event when the Columbia Daily Tribune had already published the name and address of the plaintiff Hyde] before that information was republished by the Columbia Missourian on the next day, August 21, 1980. The defendant Columbia Missourian argued, and formally moved on the basis of the interrogatory answers, dismissal for want of causation between the later publication of name and address and any injury to the plaintiff. That supplementary motion to dismiss by defendants Potter and Columbia Missourian is not part of the record nor does any disposition by the court appear. In any event, the plaintiff does not appeal the judgment in favor of those defendants so that any such dearth of a record does not hamper review.

2. The responses to the interrogatories submitted by the respective parties to the others are compended as part of the transcript on appeal and those were argued, in legal effect, by the plaintiff as facts constituent of the pleaded negligence causes of action.

   The response of the City of Columbia [through the police department] disclosed the record of the crime against person report made by the plaintiff Hyde to the Columbia police in the early morning of August 20, 1980—when the alleged abduction and assault were committed upon the plaintiff—and the numerous supplemental report records of the successive re-

ports by the plaintiff of the threats, encounters, and harassments of the unknown assailant from that date until October 20, 1980, when the case was officially closed "pending further leads."

The crime against person report made by the plaintiff Hyde on August 20, 1980, was that as she walked along Broadway [in Columbia] shortly after midnight, a white male in his late twenties, with red hair and red beard, opened the door to his red Mustang automobile, levelled a sawed-off shotgun at her and ordered her into the car and once inside, he kept the weapon trained on her and ordered: "You will do what I want you to do or I will blow your brains out." When the car started up and the assailant started to turn, his attention was distracted, so the plaintiff opened the door and jumped out. The assailant clung to her dress so that the garment tore, but she escaped. She ran down the street to a nearby disco to report the incident to the police and saw the assailant drive by twice while she awaited their arrival.

The supplemental crime against person records show that on the very night of the event— August 20, 1980—the plaintiff reported to the police that the assailant drove up to her duplex in the Mustang and read the house number. That incident occurred *after* the defendant Columbia Daily Tribune published her name and address. Then, another supplemental report shows, on August 22, 1980, in the early morning the plaintiff saw lights in her driveway and observed a red Mustang there. On that occasion, she saw the man place his shotgun on top of the Mustang, look at the residence for a moment, and then drive away. The plaintiff reported the incident to the police, and they responded. The very next day, on August 23, 1980, the plaintiff reported that as she was in the kitchen, she saw the red-bearded assailant at her back door; she fainted, and when re-

port a pleading against a motion to dismiss. Rule 55.28, *Litzinger v. Pulitzer Publishing Company*, 356 S.W.2d 81, 87[2, 3] (Mo.1962). The several defendants confront the petition, alternatively, as an attempt to plead the outrageous conduct, invasion of privacy and negligence torts—and, in turn, discount efficacy on each theory. The tenor of the petition, however, as well as the insistent disclaimer by counsel to the court on the motion argument of any other premise of recovery, make clear that the pleader intends only a cause of action in negligence. Actionable negligence encompasses essential proofs: a duty by the defendant to protect the plaintiff from harm, neglect of that duty, and injury to the plaintiff from that neglect. *Stevens v. Wetterau Foods, Inc.*, 501 S.W.2d 494, 498[7, 8] (Mo.App. 1973). To plead the ultimate fact of actionable negligence [and hence a substantive remedy well-stated], the petitioner must describe the duty owned by the defendant, the breach the petitioner charges, and the injury which results. *Einhaus v. O. Ames Co.*, 547 S.W.2d 821[4, 5] (Mo.App.1977).

The pleadings enlarged by the interrogatory evidence, understood in legal effect, posit that the plaintiff reported the kidnapping and assault to the police as an official account of a crime and not for publication, and that the municipality owed the victim a duty not to disclose her identity and address to the reporter for publication without prior consent—and so protect her from the foreseeable risk of intentional harm by the assailant, when the police knew the assailant was still at large and the practice of disclosure was otherwise forbidden in the circum-

vived, told her male companion, but by then he could detect no one outside. While he searched, the plaintiff received a telephone call and was told: "I'm glad you're not dead yet, I have plans for you before you die." The incident was also reported to the police. The police records contain numerous other incidents, among them, an encounter with the assailant at a tavern where she was with friends; at least another confrontation outside her home; a chase of the red-bearded male in the red Mustang by the male companion of the plaintiff. Then again, at her place of employment, on October 6, 1980, the plaintiff reported that as she attended a customer, she received a telephone call by a person who asked for her by name and then said: "I wanted to refresh your memory of who I am before I kill you tonight." Ten minutes later, a woman came in [whom the report describes in detail], asked for her by name and then told her: "Well, someone outside wants to talk to you, back on the lot." The plaintiff finished with a customer and went outside and saw the red Mustang in the car lot and the assailant in the car who pointed a shotgun at her and conveyed to her the threat to kill her that night.

The responses to interrogatories revealed also that the City of Columbia Police Department promulgated a Press Policy by a series of General Orders which were in effect at the time of the crime reported to the department by the plaintiff. General Order 79–22 promulgated the Press Access to Crime and Arrest Reports policy of the department:

"PROCEDURE

Copies of all police offense reports dealing with any offense shall be sent to the Press Officer, and only he shall release information to the news media except as provided for below. *Under no circumstances shall copies of police offense reports dealing with major felony crimes, such as murder, rape, robbery, and arson be released to the news media.* In lieu of releasing these reports, the department's Press Officer (or in his absence the Watch Commander) shall issue a press release following the guidelines outlined in this General Order . . . .

*  *  *  *  *  *

"I. BEFORE ARREST

A. Releases may contain the following information:

1. Location and time of the offense.

2. A description of the exact offense including a brief summary of events.

3. Injuries resulting from the action.

4. *Identity of the victim, except for a sex crime victim or a victim who can positively identify the assailant.*

5, 6, 7 . . . etc.

B. Releases may not contain the following information:

*  *  *  *  *  *

4. *Identity of witnesses, including a victim who can positively identify the assailant.*

5. *Identity of sex crime victims.* (The information should be general—race, sex and age).

[emphasis added]

The responses to interrogatories revealed also that the newspaper Columbia Daily Tribune also followed a policy not to publish the name of a crime victim who was the victim of an attempted or actual sexual offense—and that this policy "[is] based on the police department's classification of the crime." The decision to print the name and address of plaintiff in the August 20, 1980, account of the crime was made by Editor Carolyn White.

stances by internal policy,[3] but that the municipality breached the duty and the plaintiff suffered emotional harm from the intentional threats of imminent death and injury proximately caused by the negligent conduct of the City of Columbia. The pleadings understood in legal effect posit also that the defendants reporter and newspaper owed a duty to the victim not to publish her identity and address and so protect her from the foreseeable risk of intentional harm by the assailant, when they knew the assailant was still at large and the practice of publication was otherwise forbidden by internal policy,[4] but that reporter Brown and newspaper Columbia

Daily Tribune breached the duty and the plaintiff suffered emotional harm from the intentional threats of imminent death and injury proximately caused by the negligent conduct of the reporter and newspaper.

The several defendants contend, nevertheless, that these averments amount to no duty the law fixes upon them, and so none they are bound to observe. The newspaper defendants contend moreover that such a duty were onerous to the free speech and free press the First Amendment protects, and so not a valid limitation to that exercise. The several defendants argue also that, in any event, a crime against persons report is a *public record*[5] under the Sun-

---

**3.** The policy embodied in the General Orders does not, of course, establish a standard of care, which if breached, constitutes negligence. The policy, however, is probative of the conduct exacted of a reasonable actor in the circumstances and so a breach of that standard is *evidence* of negligence. *Elliott v. St. Louis Southwestern Railway Co.*, 487 S.W.2d 7, 15[9, 10] (Mo.1972); 1 Dooley, Modern Tort Law §§ 3.25–3.29 (1977). The elements of the General Orders which bear on the negligence theory the plaintiff asserts against the City of Columbia and which, by reference to the petition allegations further defines the cause of action both in terms of the specific breaches of duty and the expected proof include: the breach of General Order 79–22 Before Arrest policy paragraph A 4, in that the police disclosed her identity although she was *both* a "sex crime victim" or, if not, then "a victim who can positively identify the assailant." [The initial crime against person report records that the plaintiff-victim gave a detailed description of the assailant to the police and stated "she was sure that she could identify the subject if she observed him again." That report also included her information that the assailant did not strike her or otherwise attempt to molest her while they were in the automobile. The plaintiff is entitled to the best effect of her pleading and interstitial evidence on the motion to dismiss, however, and her reported statement does not preclude inference that the assault put her in peril of sexual attack. [Rule 55.28].

**4.** The responses to interrogatories by the defendants reporter and newspaper disclose an unwritten policy in effect on August 20, 1980, that the Columbia Daily Tribune would not print the name of a female victim of an attempted or actual sexual offense. The responses explain that those practices "are based on the police department's classification of the crime." The police department's "classification of the crime" for the purposes of its non-

disclosure policy, however, encompasses also a *victim [who] can positively identify the assailant* [the plaintiff]. The petition does not plead *in haec verba* that the reporter and newspaper breached a self-imposed duty of nonpublication, but the verified facts in the answers to the interrogatories, once again, were competent evidence to complete the intervals of the petition as against a motion to dismiss [Rule 55.28]. Taken most favorably to the negligence cause of action, and *for the purpose of the motion to dismiss for failure to state a cause of action*, those facts allow inference—not only that the defendants reported and published the identity of a female victim of sexual assault—but also that the newspaper policy of nondisclosure was *coextensive with the police department policy of nondisclosure and so encompassed also "a victim [the plaintiff] who can positively identify the assailant."*

**5.** It is evident that the several defendants do not treat *all* crime against persons reports as *public records*. The practice of the police department under the written delineation of policy [and given acquiescence by the reporter and newspaper by unwritten policy] excludes from disclosure the identity of a female victim of an attempted or actual sexual offense—*as well as* where the victim can positively identify the assailant [General Order 79–22, BEFORE ARREST, A. 4.; B. 4.]. Other components of that General Order exclude numerous other categories of information from release—such as information about unidentified suspects, "misleading or false information," identity of suspects interviewed but not charged, among the several others. In addition, other PRESS POLICY General Order 78–15, among others, and the Rules and Regulations of the City of Columbia Police Department disclose that the release of information to the news media is selective [Rules and Regulations, Chapter 1, 420.50]:

shine Law [§§ 610.010 to 610.120], thus, to give publicity to information already public can engender no liability.

■ In negligence jurisprudence, whether a duty exists presents a question of law. Restatement (Second) of Torts § 4 (1965). When the existence of a duty to use due care rests on a relationship between persons, the law has simply placed the actor under obligation for the benefit of another person—the plaintiff—in the given circumstances. Or, more simply, the law has determined that "the interest of the plaintiff which has suffered invasion [is] entitled to legal protection at the hands of the defendant." Prosser, The Law of Torts § 37, p. 206 and § 53 (4th ed. 1971). Thus, essential to liability for negligence is a relationship the law recognizes as the basis of a duty of care between the inflictor of injury and the person injured. *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52, 55 [6, 7] (Mo.1952). The judicial determination of the existence of a duty rests on sound public policy as derived from a calculus of factors: among them, the social consensus that the interest is worthy of protection; the foreseeability of harm and the degree of certainty that the protected person suffered injury; moral blame society attaches to the conduct; the prevention of future harm; considerations of cost and ability to spread the risk of loss; the economic burden upon the actor and the community—and others. 1 Dooley, Modern Tort Law, Liability & Litigation § 3.03 (Supp.1981); *Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, 732[7–9] (bank 1980); *Donohue v. Copiague U. Free School District*, 64 A.D.2d 29, 407 N.Y.S.2d 874, 877[3, 4] (1978). To these determinants we add that, when the actor is a public agency [or quasi-public institution, such as the press], the role the law assigns to that function. Potter Stewart, *"Or of the Press,"* 26 Hastings L. J. 631, 633 (1975).

"The scope and content of each release of information must be determined according to the facts of each situation."
The defendant municipality does not say how a record can be public under the Sunshine Law

■ Our law imposes the duty on an actor in some circumstances to foresee that the misconduct of a third person will result in injury to another [the plaintiff] and imposes liability for failure to protect against that risk of harm. *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52, 55[2–7] (1952); Restatement (Second) of Torts § 302B (1965). This principle of liability has scope even where the misconduct of the third person is intentional or criminal. *Scheibel v. Hillis*, 531 S.W.2d 285 (Mo. banc 1976) expounds the standard [a paraphrase of Restatement (Second) of Torts § 449 (1965)], l.c. 288[9]:

[I]f the foreseeable likelihood that a third person may act in a particular manner is one of the hazards which makes a person negligent, such an act of a third party, whether innocent, negligent, intentionally tortious or criminal, does not prevent that person from being liable for the harm caused thereby.

*See also Butler v. Circulus, Inc.*, 557 S.W.2d 469, 475 (Mo.App.1977). Thus, conduct may be negligent solely because the actor should have recognized that it would expose the person of another to an unreasonable risk of criminal aggression. Restatement (Second) of Torts § 448, comment c (1965). In certain situations, the law expects a reasonable actor to anticipate and protect the plaintiff against the intentional or criminal misconduct of a third person whom the actor has given occasion for association with the plaintiff, when the actor knows or should know that the third person is "peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity for temptation for such misconduct." Restatement (Second) of Torts § 302B, comment e, note D (1965). The factors which prompt a reasonable person to such precaution are, among others [Restatement (Second) of Torts § 302B, comment f (1965) cited in *Scheibel v. Hillis*, supra, l.c. 288[7, 8]]:

and yet be withheld from disclosure, nor what authority of law commits that discretion to the recordkeeper [*see* § 610.025.5].

"the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, . . . ."

See also Butler v. Circulus, Inc., supra, l.c. 475; Prosser on Torts § 33, 174 (4th ed. 1971).

■ The averments of the petition given the most favorable intendment as a negligence cause of action fall within these statements of principle and incidences of tort liability. The allegations by the female plaintiff that she was abducted by an unknown assailant, made escape, then gave official report of the crime [and description of the assailant] to the municipal police, the release of the name and address of the victim by the police to the reporter without her consent and with knowledge that the assailant was still at large, and the publication of that information by the newspaper also with that knowledge, describe conditions which posed an especial temptation and opportunity to the third-party assailant for intentional and criminal aggression upon the victim to her injury, and so plead a prima facie breach of duty—unless, as the municipality and newspaper contend, the information was a *public record* under the Sunshine Law and otherwise protected by

the First Amendment.[6] The press enjoys no constitutional right to police records. The right of the press for access to governmental records, rather, is no greater than by the public generally. *Pell v. Procunier*, 417 U.S. 817, 850, 94 S.Ct. 2800, 2815, 41 L.Ed.2d 495 (1974). The right of the defendant news medium to *have* the name and address of the victim from the municipal police, therefore, depends upon whether that information was a *public record*.

The common law gave access to public records only where the citizen could show that the purpose of inspection was to vindicate a private or public right. *State ex rel. Conran v. Williams*, 96 Mo. 13, 8 S.W. 771, 773 (1888). The legislature then enacted §§ 109.180 and 109.190 to open all state, county and municipal records kept under statute or ordinance to personal inspection "by any citizen of Missouri"—a privilege not to be refused "to any citizen."[7] Whatever vestige of a common law interest to enable inspection lingered in §§ 109.180 and 109.190 was swept away by the enactment of the Sunshine Law [§§ 610.010 through 610.120]. That chapter defines a *public record* as *any record retained by or of any public governmental body* [§ 610.-010(4)][8] and then directs that *the public records shall be open to the public for inspection and duplication* [§ 610.015]—sub-

---

**6.** We continue to assume that the circumstances described in the petition as intersticed by the responses in support give rise to a duty by the municipal and news medium defendants to the plaintiff the law protects. We defer that assessment, as a principle finally determined, until we resolve the contentions that the name and address of the victim were public information and that the publication was otherwise constitutionally protected.

**7.** The expansive scope of disclosure the § 109.-180 terminology portends, however, is qualified by the § 109.190 provision that the right to photograph public records extends to "all cases where the public or any person *interested* has a right to inspect." [emphasis added] That the statute does not discard altogether the *common law* precondition of *interest* to qualify for access to the public records becomes evident from the sparse judicial authority to construe the §§ 109.180 and 109.190 enactments. See

*Kirkwood Drug Company v. City of Kirkwood*, 387 S.W.2d 550, 555[8] (Mo.1965); *State ex rel. Collins v. Donelson*, 557 S.W.2d 707, 710[4] (Mo.App.1977).

**8.** Section 610.010(2) defines "*Public governmental body*" as:

any constitutional or statutory governmental entity, including any state body, agency, board, bureau, commission, committee, department, division, or any political subdivision of the state, of any county or of any municipal government, school district or special purpose district, any other governmental deliberative body under the direction of three or more elected or appointed members having rulemaking or quasi-judicial power . . . .

The litigants do not contest that the City of Columbia and its police department function constitute a *public governmental body* under the Sunshine Law.

ject only to the enumerated exceptions of § 610.025.[9]

The integral Law opens to the public— even without an interest to vindicate—the meetings and records of those entrusted with the public business. *Cohen v. Poelker*, 520 S.W.2d 50, 52[1] (Mo. banc 1975); *State ex rel. Gray v. Brigham*, 622 S.W.2d 734, 735[2, 3] (Mo.App.1981). The enactment exempts from open convocation, the meetings, and from disclosure, the records, enumerated in § 610.025. Thus, the legislators understood that to accomplish that preeminent value of a free society involves a counterpoise of considerations: the openness of public records against the confidentiality essential to the proper conduct of certain governmental operations. *Wilson v. McNeal*, 575 S.W.2d 802, 805 (Mo.App.1978). An *arrest* record is made a public record— not by the omnibus definition of § 610.-010(4) [*any record retained by or of any public governmental body*]—but by implication of separate § 610.100.[10] The infor-

mation disclosed by the municipal police department to the reporter and published by the newspaper was not from a record of arrest, but from a criminal investigation record. The enumerations of § 610.025 do *not* exempt from disclosure the investigation records of a law enforcement agency. [In that respect, our Conduct of Public Business [Sunshine] Law stands alone and singular from all other such enactments.] Thus, absent an intention otherwise discernible from the statutory purpose as aided by construction of the text, the records of the criminal investigation process up to the event of arrest are public records and altogether unprotected from disclosure on demand.

The spate of freedom of information and open records enactments [such as our Sunshine Law] which have burgeoned during the past decade or more attest to a community insistence that in a democracy the affairs of government are rightfully conducted in the open.[11] The resultant enactments

**9.** Section 610.025. *Closed meetings authorized, when*

    1. Any meeting, record, or vote of judges, or a jury during the deliberation of a verdict, meetings of a grand jury, juvenile court proceedings, and court proceedings involving legitimacy, illegitimacy, adoption, or probation and proceedings involving parole may be a closed meeting, closed record, or closed vote.

    2. Any meeting, record or vote pertaining to legal actions, causes of action, or litigation involving a public governmental body, leasing, purchase or sale of real estate where public knowledge of the transaction might adversely affect the legal consideration therefor may be a closed meeting, closed record, or closed vote.

    3. Any meeting or record of the state militia or national guard or any part thereof may be a closed meeting or closed record.

    4. Any nonjudicial mental health proceedings and proceedings involving physical health, scholastic probation, scholastic expulsion or scholastic graduation, welfare cases, meetings relating to the hiring firing or promotion of personnel of a public governmental body may be a closed meeting, closed record, or closed vote.

    5. Other meetings, records or votes as otherwise provided by law may be a closed meeting, closed record, or closed vote.

**10.** Section 610.100. *"Arrest records, closed, when—expunged, when:*

    —If any person is arrested and not charged with an offense against the law within thirty days of his arrest, official records of the arrest and of any detention or confinement incident thereto *shall thereafter be closed records* except as provided in section 610.-120." [emphasis added]
*See Herald Company v. McNeal*, 553 F.2d 1125, 1129 n.7 (8th Cir. 1977).

**11.** The purpose of the Federal Freedom of Information Act, 5 U.S.C. § 552 et seq., a prototype for such statutes, was given by the United States Supreme Court in *National Labor Relations Board v. Robbins Tire and Rubber Company*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978), l.c. 242, 98 S.Ct. 2327: "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *See also GTE Sylvania, Inc. v. Consumers Union of the United States*, 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980).

    That sense of purpose also informs the numerous state enactments which include a declaration of policy in the legislation: For instance: Ark.Stat.Ann. § 12–2802 (as amended 1976): "*Declaration of Public Policy*—It is vital in a democratic society that public business be performed in an open and public manner so that the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in mak-

are of two categories: those which relate to meetings alone [Alaska Stat. § 44.62.310 (1976); Ariz.Rev.Stat.Ann. §§ 38–431 et seq. (1978); Minn.Stat. § 471.705 (as amended 1975), among others] and those which relate to meetings and records—our Sunshine Law, among them.[12] Those enactments, whatever the category, *all* [the Sunshine Law included] provide that certain governmental business may be conducted in closed session. Those enactments which encompass records, *all* [the Sunshine Law included] provide that certain governmental records may remain confidential from public disclosure. These enactments *all—except* for our Sunshine Law—exempt from disclosure records of the criminal investigation process for law enforcement purposes. A typical exemption is 5 U.S.C. § 552(b)(7) of the Federal Freedom of Information Act which excludes from public disclosure:

> investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) *deprive a person of a right to a fair trial or an impartial adjudication,* (C) *constitute an unwarranted invasion of personal privacy,* (D) *disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation,* or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by a confidential source, (E) *disclose investigative techniques and procedures,* or (F) *endanger the life or physical safety of law enforcement personnel.* [emphasis added]

Other state enactments are variants of that prototype and refuse to open records which, in addition to the considerations the federal Act delineates, *"endanger ... the life, health or property of any person"* [S.C.Stat. Ann. § 30–4–40(3)(D) (as amended 1980)] or *"endanger the safety of a witness or other person involved in the investigation."* [Cal. Gov't. Code § 6254(a), (f) (West) (as amended 1977)]. The exemptions represent a balance struck between the right of the public to know the activity of government and the equally public interest that the records of certain governmental functions remain free from disclosure. *Administrator, Federal Aviation Administration v. Robertson,* 422 U.S. 255, 261[1, 2], 95 S.Ct. 2140, 2145, 45 L.Ed.2d 164 (1975); *Lodge v. Knowlton,* 391 A.2d 893, 895[1] (N.H.1978); *Stephens v. Van Arsdale,* 227 Ky. 676, 608 P.2d 972, 981[9] (1980); *Northside Realty Associates, Inc. v. Community Relations Commission of Atlanta,* 240 Ga. 432, 241 S.E.2d 189, 191[1] (1978). Thus, the several Freedom of Information Acts [other than our Sunshine Law] determine legislatively that, not only is the efficient suppression and punishment of a crime a function of government so paramount that the disclosure of that governmental activity give way to the need to retain them as confidential,[13] but that the protection of persons upon whom that function impinges serves the same public interest.

The text of these statutes as well as the decisions which construe them determine the public interest, not only in terms of avoidance of impediment to the criminal

---

ing public policy ...."; Maine Rev.Stat.Ann. tit. 1, § 401 (1975): Declaration of public policy, etc.: "The Legislature finds and declares that public proceedings exist to aid in the conduct of the people's business ...."

**12.** *Wilson v. McNeal,* 575 S.W.2d 802 (1978), l.c. 809, n.5 enumerated twenty-eight such enactments at the time of decision, the Federal Freedom of Information Act, excluded. We count eleven more [Colorado, Georgia, Hawaii, Kansas, Montana, Nebraska, New Hampshire, North Dakota, South Carolina, Tennessee and Texas] and the District of Columbia, also.

**13.** The public policy that the criminal law shall not be impeded is so cogent that the Attorney General of South Carolina by opinion (Op.Atty. Gen., No. 77–193, p. 146] simply advised that police criminal investigatory files were not *public records* under the South Carolina Freedom of Information Act of 1976–77, even though those records were not among those enumerated for exemption under that statute. The statute was immediately amended to exclude from disclosure records of law enforcement and public safety agencies in numerous particulars. S.C.Stat.Ann. § 30–4–40 (as amended 1980).

investigation process,[14] but also in terms of protection of the privacy, the reputation, the person, *and the lawful and constitutional prerogatives* of those the criminal investigation process enmeshes.[15] The practice of the municipal police department conforms to these exceptions—whatever the formal profession that the reports of crime and consequent investigations are public

records under the Sunshine Law. The promulgated rules and policies of the municipal police department, rather, are a careful construct which deliberately balances the public interest in the disclosure of investigative material against the privacy, safety, and legal rights of the persons whom that release of information affects and the public safety function of the department.[16] The

14. The protection of confidential sources, confidential information, confidential investigative techniques, the safety of law enforcement personnel among others, are considerations often cited in the statutes and decisions which the public interest requires be given precedence over the open access to that information 5 U.S.C. § 552(b)(7); Cal.Gov't.Code § 6254(f) (West) (as amended 1977); Conn.Gen.Stat. Ann. § 1–19(b) (1977); Ill.Rev.Stat. § 102–42–2 (as amended 1977), among the other enactments; *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *Aspin v. Department of Defense*, 491 F.2d 24 (D.C.Cir.1973); *Lodge v. Knowlton*, 118 N.H. 574, 391 A.2d 893 (1978); *Jensen v. Schiffman*, 24 Or.App. 11, 544 P.2d 1048 (1976) among the other decisions.

15. The numerous statutes protect, variously, against disclosures of information gleaned during the criminal investigation process which constitute an "unwarranted invasion of personal privacy" [5 U.S.C. § 552(b)(7); Conn.Gen. Stat.Ann. 1–19(b) (1977); Cal.Gov't.Code § 6254(c) (West) (as amended 1977)], or *"would endanger the safety of a witness or other person involved in the investigation"* [Cal.Gov't.Code § 6254(f) (West) (as amended 1977)] [emphasis added]; Mich.Stat.Ann. § 4.-1801(13)(1)(t)(vii) (1976)], and also the right to a fair trial [5 U.S.C. § 552(b)(7); Mich.Stat.Ann. § 4.1801(13)(1)(b) (1976)]. Thus, the exceptions to the open records acts are designed, as a matter of public interest, to preserve the constitutional rights of privacy and to a fair trial, among others.

A pervasive judicial rationale exempts investigative files from disclosure because such records "are apt to consist of remarks, gossip, guesses, impressions, hearsay, irrelevant information, comments, surmises, data and facts." *Wilson v. McNeal*, 575 S.W.2d 802 (Mo.App. 1978). [*Wilson* deals with records "relating to hiring, firing or promotion of a public governmental body" exception to the Sunshine Law [§ 610.025] it dealt with the role of entries in the course of an internal affairs police personnel investigation, and does not bear further on our concern. We note, nevertheless, that the police report records before us as responses by the Columbia municipal police department to the interrogatories of the plaintiff fulfill that judicial surmise and suggest urgent reason for

a *legislatively*-defined police investigation exemption to the Sunshine Law definition of *public records.*]

16. Columbia Police Department—Rules and Regulations, Chapter I 1–420.20 ROLE OF THE DEPARTMENT. The Department actively seeks to establish a cooperative climate in which the news media may obtain information on matters of public interest in a manner which does not hamper police operations. However, *certain information must be withheld from the news media in order to protect the constitutional rights of an accused, to avoid interfering with a Department investigation, or because it is legally privileged.*
1–420.50 SCOPE AND CONTENT OF THE RELEASE OF INFORMATION. The scope and content of each release of information must be determined according to the facts of each situation. Generally, a description of the circumstances which is *not legally privileged and* which *will not prejudice the rights of suspects or interfere with an investigation* will be made . . . .
1–440.10. REQUESTS FOR INFORMATION. The public has an abiding interest in law enforcement and in the activities of the Department. The news media and members of the public frequently direct inquiries to the Department seeking information on a variety of subjects. While it is the aim of the Department to fulfill such requests, it is not always possible to do so. *Whether to release information or to grant interviews will be determined according to the facts of each case."*
Nor are the contents of the offense reports, even of lesser felonies, released in whole upon request. The practice is otherwise. General Order 79–22 delineates precisely the information the municipal police department will release, and which it will not release. As we noted, General Order 79–22 does not allow disclosure of the identity of a *victim of a sexual crime who can positively identify the assailant, before arrest.* Nor does that General Order allow the release of the identity of a *witness* [to any crime], *including a victim who can positively identify the assailant. Even after arrest* that General Order prohibits the release of comments in the record about the "character or

municipal police department, as a matter of fact, denies the public access to investigative records which tend to compromise the constitutional rights of an accused to the presumption of innocence and to a fair trial—or those which tend to expose a complainant to embarrassment, loss of privacy or personal harm. In a word, to staunch information otherwise free to flow on request, the municipal agency has fashioned *de facto* exceptions to the Sunshine Law [among them, to deny the public access to the name of a witness who can identify the assailant still at large] other legislatures have established *de jure.* The *de facto* practice of an agency, however, does not amount to legislation. Nor does such a self-determined rule of nondisclosure, no matter by how fine a balance of public interests, transform records otherwise made public by legislative definition into confidential files.

Our Sunshine Law and the counterpart statutes of the several states [the Federal Freedom of Information Act included] declare a common public policy in favor of open governmental meetings and records. *Cohen v. Poelker,* 520 S.W.2d 50, 52[1] (Mo. banc 1975); *N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 220[1], 98 S.Ct. 2311, 2316, 57 L.Ed.2d 159 (1978); *Houston v. Rutledge,* 237 Ga. 764, 229 S.E.2d 624, 626 (1976); *Lodge v. Knowlton,* 118 N.H. 574, 391 A.2d 893, 894[1] (1978); *Commercial Printing Co. v. Rush,* 261 Ark. 468, 549 S.W.2d 790, 793[1] (1977); *Krause v. Reno,* 366 So.2d 1244, 1250[1] (Fla.App.1979). These enactments, nevertheless, exempt from disclosure those phases of governmental operations which the public interest requires be kept confidential. Our state shares with all the others the paramount concern of the sovereign to protect the people against public injury and to prosecute

those who offend. *State v. Glover,* 500 S.W.2d 271, 274[11–13] (Mo.App.1973); 21 Am.Jur.2d *Criminal Law* § 1 (1981). These *other* enactments find that the public interest preponderates to exempt criminal investigation information from disclosure under freedom of information acts. The statutes and decisions of other states, of course, do not determine our legislative public policy nor do they control our judicial decisions. They are apt sources, however, for guidance on common subjects and statutes—especially those which declare a shared policy. *Wilson v. McNeal,* 575 S.W.2d 802, 808 (Mo. App.1978); [17] *Stephenson v. McClure,* 606 S.W.2d 208, 211[3] (Mo.App.1980).

Our duty is to give the Sunshine Law the effect the legislature intended. To that end our guides, among others, are: the evil the enactment means to remedy, the assumption that the legislative purpose was a reasonable one, *the presumption that the law was passed for the welfare of the community, that an effective law was intended* —and *"not an ineffective or insufficient one."* [emphasis added] *Cohen v. Poelker,* 520 S.W.2d 50, l.c. 52 (Mo. banc 1975). To that end also, we look to the integral text and purpose which inform the act as a whole. *Kirkwood Drug Company v. City of Kirkwood,* 387 S.W.2d 550, 554[5] (Mo.1965). The clear purpose of the Sunshine Law is to open official conduct to the scrutiny of the electorate—but not [as the exemptions attest] at the expense of essential governmental functions or of the vital personal interests of the citizenry. We assume the legislature intended an effective act, one passed for the welfare of the community. *Cohen v. Poelker,* supra, l.c. 52. We assume also that the legislature intended an enactment within constitutional standards. *Kirkwood v. Allen,* 399 S.W.2d 30, 36[6–9] (Mo. banc 1966). We assume also, that the legislature

---

reputation of the defendant" or of "the refusal of an accused to make a statement." These strictures merely reflect the *Policy* of the police department [General Order 79–22, Policy 2] to "[p]rotect the rights of the accused by restricting pretrial publicity."

**17.** *Wilson,* supra, resorted to the texts of numerous counterpart open records statutes to

support decision that the "relating to the hiring, firing or promotion of personnel of a public governmental body" exception to the Sunshine Law [§ 610.025(4) ] did not require the agency to open the investigative records to the public even after the personnel proceeding terminated and was closed.

intended an enactment free from unjust, oppressive or absurd consequences. *State v. Tustin*, 322 S.W.2d 179, 182[2, 3] (Mo.App. 1959); *Peper v. American Exchange Nat. Bank in St. Louis*, 205 S.W.2d 215, 221[8, 9] (Mo.App.1947).

▮ To construe the Sunshine Law to open *all* criminal investigation information to *anyone* with a request subserves neither the public safety policy of our state nor the personal security of a victim—but rather, courts constitutional violations of the right of privacy of a witness or other citizen unwittingly drawn into the criminal investigation process as well as the right of an accused to a fair trial. Such a construction leads to the absurdity [adroitly drawn by the defendants] that an assailant unknown as such to the authorities, from whom the victim has escaped, need simply walk into the police station, demand name and address or other personal information—without possibility of lawful refusal, so as to intimidate the victim as a witness or commit other injury. We are not free to fashion another formal exception to the Sunshine Law to exclude, even if only presumptively, *every* official entry of the prearrest investigative process from disclosure to the public on request, however egregious we consider the legislative lapse. *Missouri Public Service Co. v. Platte-Clay Electric Cooperative*, 407 S.W.2d 883, 891[12–14] (Mo.1966). The contours of any such public policy, balanced and counterpoised between the disparate interests in open government and a secure citizenry, is for the legislature. We can—and do—take the enactment as it comes and impart the legislative intent a reasonable consequence—unless no other construction remains possible. *Hawkins v.*

*Smith*, 242 Mo. 688, 147 S.W. 1042, 1045[7] (1912); *State ex rel. Dravo Corporation v. Spradling*, 515 S.W.2d 512, 517[5, 6] (Mo. 1974). To avoid an absurd—even unlawful—application of the statute as written, we determine that the name and address of a victim of crime who can identify an assailant not yet in custody is not a *public record* under the Sunshine Law.

In the absence of an obligation imposed by the statute, the disclosure of the name and address of the victim-plaintiff by the municipal police department to the reporter was gratuitous. The disclosure served no essential criminal investigation role of the police, but rather was a foreseeable impediment to that function by the encouragement of an obstruction of justice by the assailant. The disclosure was also a threat to the very personal safety of the victim. The deliberate practice of the municipal police department to withhold information of that ilk from the general public attests to the fact that the risk of injury to the victim-plaintiff from disclosure was foreseeable. The petition pleads a state of facts which, taken as true, give rise to a duty by the municipal police to foresee risk of injury to the victim-plaintiff by the act of the assailant from the disclosure for publication of her name and address. *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52, 55[6, 7] (Mo.1952); Restatement (Second) of Torts §§ 302B and 449 (1965).[18]

The defendant reporter and newspaper contend that the report of the abduction by the victim to the police—facts pleaded in the petition—was her consent to the preparation of the formal crime report and its subsequent publication by the news medi-

---

**18.** The existence of a duty the law of negligence recognizes and redresses upon breach, we noted supra, is a serious determination of public policy derived from factors of an interest worthy of protection, the moral blame society attaches to the conduct, etc., and also the economic burden upon the actor and community. *See Thompson v. County of Alameda*, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, 732[7–9] (bank 1980) and 1 Dooley, Modern Tort Law, Liability & Litigation § 3.03 (Supp.1981). The appeal presents only the petition stage of litigation. There are no responsive pleadings before

us, and hence no affirmative defenses. The question whether a municipal instrumentality [and hence the community] shall be exposed to tort liability and the cost of reparation, of course, is one of a basic public policy—now finally determined by our legislature by the enactment of Sovereign Immunity §§ 537.600 and 537.610, RSMo Supp. 1981. *See Bartley v. Special School District of St. Louis County* (Mo.App.E.D. No. 44396, adopted February 2, 1982); *Carmelo v. Miller*, 569 S.W.2d 365 (Mo.App.1978).

um. That argument disregards altogether the duty of citizenship to report criminal conduct—to raise a "hue and cry" of felony to the authorities. *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 1363[3], 63 L.Ed.2d 622 (1980).

■ That the victim-name-and-address information kept by the municipal police department was by law confidential does not mean that once disclosed to a newspaper it retained its confidential character. Nor do allegations which suffice to plead a cause of action against the official keeper for the negligent release of that confidential record *ipso facto* suffice as a tort cause of action against a news medium for publication of that information. The difference reposes in the favor the Free Speech and Free Press components of the First Amendment display for the autonomy of the institutional press. *New York Times Company v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) "So far as the Consti-

tution goes, the autonomous press may publish what it knows, and may seek to learn what it can." Potter Stewart, *"Or of the Press,"* 26 Hastings L.J. 631, 636 (1975).

■ The defendants reporter and newspaper contend that the report of crime was a matter of legitimate public concern and interest so that the adjudication of tort liability for the publication of that information were an impermissible interference with the exercise of free speech and of a free press in violation of the First Amendment.[19] The defendants develop argument in terms of *newsworthiness* of the publication and the status of the victim-plaintiff as a subject of public interest. They apply these considerations and commingle them with the invasion of privacy, outrageous conduct and defamation torts. The petition, however, pleads negligence—a tort which protects an interest distinctive from the other torts. The First Amendment protects a news medium from tortious publica-

---

**19.** That brief argues also that the dismissal of the petition was proper because the news medium defendants merely gave further publicity to information already public. We have determined that the name and address of the victim under the circumstances pleaded was not public information under the Sunshine Law. Nor was that information a component of an arrest report—and so a public record under §§ 610.-100 and 610.105, nor a judicial record—and so open to the public and news media alike. *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

The defendant municipality also argues the public interest of the subject matter of the publication to justify disclosure to the news medium in the first instance. The municipal police department, however, was bound to observe the strictures of the statute [Sunshine Law] and did not enjoy the same superseding constitutional favor the First Amendment accords the news media. That the information was a matter of public interest, therefore, would not excuse that initial disclosure and the breach of confidentiality the statute imposes on the record-keeper.

If the argument intends to assert that the disclosure to the news medium was an exercise of the qualified privilege allowed the police to communicate information attendant to the performance of an official duty—not otherwise opened by the Sunshine Law—the common law rule of qualified privilege applies only to subserve a *substantial interest of the public*, such as the prevention of crime and the apprehension of criminals. *Woolbright v. Sun Commu-*

*nications, Inc.*, 480 S.W.2d 864 (Mo.1972). The fact of an *arrest* [as the terms of § 610.100 of the Sunshine Law imply] is also such a matter of *public interest* as to enjoy the protection of a qualified privilege as to its contents under the common law. *Turnbull v. Herald Company*, 459 S.W.2d 516 (Mo.App.1970). The *fact of a crime* is also such a matter of *public interest* as to invoke the common law qualified privilege on behalf of the police official as well as the newspaper publisher of the event. *Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385 (Mo. 1963). "On the other hand, statements made by the police or by the complainant or other witnesses ... as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged ...." Restatement (Second) of Torts § 611, comment h (1977).

We should note, since the several defendants argue the term *public interest* without differentiation as to its constitutional as distinct from its common law content, that the privilege of a police officer to communicate official information to another appertains only as to statements made in the proper exercise of the official duty—such as to allay a public danger. *Woolbright v. Sun Communications, Inc.*, supra. *See* Restatement (Second) of Torts §§ 598 and 598A and comments (1977). The privilege of a *news medium* to communicate on a matter of public or general interest rests on constitutional principles we discuss *infra*.

tion to the extent that the interest in free speech and free press overbalances the governmental interest the tort protects. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), culminates the development of that First Amendment analysis of the accommodation between a free press and the law of torts which began in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[20]

*New York Times v. Sullivan*, supra, held that the First Amendment protects a newspaper from liability for defamatory publications about the official conduct of a public official unless done with actual malice [l.c. 283, 84 S.Ct. 727]—with a knowing falsity or reckless disregard for the truth. That decision rested on the rationale that the First Amendment protected erroneous speech exercised in good faith more than the personal reputation of a public official —and, cognately, that the threat of large damage awards unduly inhibits open debate on public issues. Brosnahan, *From Times v. Sullivan to Gertz v. Welch: Ten Years of Balancing Libel Law and the First Amendment*, 26 Hastings L.J., 777, 781 (1975). Three years later, in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) the *New York Times* constitutional privilege was applied to the tort of invasion of privacy where the subject of the publication was "newsworthy" [the constitutional standard the news media defendants assert to avoid liability to the victim-plaintiff]. That same year, the constitutional privilege was extended to defamatory publications about "public figures" [*Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) and *Associated Press v.*

*Walker*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)]—persons who [per Warren, C. J., concurring, l.c. 164, 87 S.Ct. 1996] "by reason of their fame, shape events in areas of concern to society at large" and also those who are "intimately involved in the resolution of important public questions." Then, in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) a plurality of the United States Supreme Court averted the focus of inquiry altogether from the *status* of the person defamed [a public figure or public official] to the event reported to determine whether the *New York Times* privilege— and actual malice test—appertained.[21] That constitutional analysis was swept away altogether, however, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

█ *Gertz* repudiated the public interest-newsworthy test [the principle the news media defendants assert to avoid liability to the victim-plaintiff] in actions for defamation and balanced, rather, the free speech free press values against the cogent state interests in the compensation of private injury to reputation. In that analysis, the Court acknowledged the unique role of the institutional press under the constitution. The Court then noted that [l.c. 344, 94 S.Ct. 3009]:

> The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. *Public officials and public figures usually enjoy significantly greater access to the chan-*

---

**20.** The defendants cite Missouri cases since dated by later First Amendment development [*Williams v. KCMO Broadcasting Division, etc.*, 472 S.W.2d 1 (Mo.App.1971), among others]. These cases, although superseded in terms of federal constitutional principle nevertheless remain relevant [as *Gertz*, supra, holds] to both define the state interest and the local rules of law which delimit remedy.

**21.** The rationale of that analysis was a three-justice judgment concurred in by two other justices, [per Brennan, J., l.c. 43, 91 S.Ct. 1819]:

> "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. *The public's primary interest is in the event; the public* focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." [emphasis added]

nels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater. [emphasis added]

The Court then used a normative standard to constrict the *public figure* definition earlier rendered in *Gertz* [l.c. 345, 94 S.Ct. 3009]:

[T]hose who attain this [public figure] status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

It is thus the public figure—private person dichotome [and not the newsworthiness of the conduct] which determines between a public and private defamation plaintiff— and hence whether the stricture of the *New York Times* constitutional privilege applies.[22] *Gertz* determines also [l.c. 348, 94 S.Ct. 3011] "the strong and legitimate state interest in compensating private individuals for injury to reputation" and releases a private person defamed by a news medium publication to the state common law remedy.

To accommodate the free press with the state interest to protect private reputation, *Gertz* struck a final constitutional balance:

The *New York Times* actual malice [knowing or reckless falsity] standard of liability appertains only to the defamation of public officials or public figures. [*Gertz*, l.c. 343, 94 S.Ct. 3088]

The state may not impose liability without fault [the usual common law rule] against the news media; a plaintiff must prove *at least negligence* against the publisher. [*Gertz*, l.c. 347, 94 S.Ct. 3010] The recovery is limited to compensation for actual damages and compensation for a tort injury. [*Gertz*, l.c. 348, 94 S.Ct. 3011]

A recovery for punitive damages is allowed *only* where upon proof of a reckless falsity the *New York Times* knowing or reckless falsity standard of liability. [*Gertz*, l.c. 350, 94 S.Ct. 3012]

The *Gertz* constricted definition of *public figure* was reaffirmed in *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). Then in *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) the United States Supreme Court once again repudiated *newsworthiness* as a determinant for the application of the *New York Times* privilege against news medium liability and reaffirmed the *Gertz* public figure—private person test to hold [l.c. 167, 99 S.Ct. 2707]: "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention"—in that case, a criminal event.

The cause of action the victim-plaintiff asserts against the news medium defendants is for *negligence*, and not on any theory of liability without fault. The events the petition describes are of a private person become unwilling victim of a crime—not of one who has injected her person into a public controversy. The damages she pleads are for actual loss. In sum, the petition comes validly within the culminated constitutional balance struck by *Gertz* which allows a private redress against a newspaper for a negligent publication of information on a theory of fault

22. *The Gertz rationale* also presumably repudiates the *newsworthiness* test for the application of the *New York Times* privilege to a case of invasion of privacy in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). *See Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 250, 95 S.Ct. 465, 469, 42 L.Ed.2d 419 (1974); *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 85 N.6 (D.C.App.1980); Nimmer, *The Right to Speak From Times to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy*, 56 Cal.L.Rev. 935 (1968).

free from the proof constraints of *New York Times.* The question remains then whether under the negligence law of our state the petition pleads a cause of action.

The contentions of the several defendants confront the petition, variously, as a cause of action for defamation, invasion of privacy, and for outrageous conduct. Their constitutional, as well as local law, arguments recite principles apt to defamation and privacy, but not negligence cases.[23] The defendants assume that each of those remedies protects the same private interest. They do not. The defamation remedy protects reputation. *Laun v. Union Electric Co. of Missouri*, 350 Mo. 572, 166 S.W.2d 1065 (1942). The right of privacy remedy protects personal sensibility from public disclosure of private facts and from the appropriation of the likeness or name. Restatement (Second) of Torts §§ 652A and B (Tent. Draft No. 13, 1967); Prosser, The Law of Torts, 804 et seq. (4th ed. 1971). The outrageous conduct remedy protects against intentional or reckless infliction of emotional distress. *Pretsky v. Southwestern Bell Telephone Co.*, 396 S.W.2d 566 (Mo. 1965). Restatement (Second) of Torts § 46 (1965). The negligence remedy extends to protect against invasion of bodily security even to life itself. It is palpable, however, that whatever the scope of interest these torts protect, when asserted against a news medium publication of official action or other communication in the public interest, each confronts the paramount social utility of a press free to report on topics of public concern. *Laun v. Union Electric Co. of Missouri*, 350 Mo. 572, 166 S.W.2d 1065, 1069[9] (1942); *Cook v. Pulitzer Publishing Co.*, 241 Mo. 326, 145 S.W. 480, 489 (1912); Restatement (Second) of Torts §§ 598, 611 and 652D (1976). In such a case, the interest the suitor attempts to vindicate— whether by an action for defamation, or invasion of privacy, or negligence—encounters the privileges and other protections the common law accords to publications of *legitimate public concern*, otherwise tortious. *Langworthy v. Pulitzer Publishing Company*, 368 S.W.2d 385, 389[9–12] (Mo.1963); *Tilles v. Pulitzer Co.*, 241 Mo. 609, 145 S.W. 1143, 1152[7] (banc 1912); Restatement (Second) of Torts §§ 598, 611 and 652D (1976); Prosser, The Law of Torts §§ 114, 115 (4th ed. 1971).

The determination of what is a matter of public concern is for the court in the first instance [*Barber v. Time, Inc.*, 348 Mo. 1199, 159 S.W.2d 291, 295[9, 10] (1942)] as is the cognate consideration—whether the occasion is one to which a qualified privilege extends [*Warren v. Pulitzer Publishing Co.*, 336 Mo. 184, 78 S.W.2d 404, 415[12–16] (1934)]. The privilege obtains, however, only as to information which affects a *sufficiently important public interest.* Restatement (Second) of Torts § 598(a) (1977). Our decisions, under common law precepts, find that a news medium publication of an arrest [*Turnbull v. The Herald Company*, 459 S.W.2d 516 (Mo.App. 1970)], a criminal event [*Langworthy v. Pulitzer Publishing Company*, 368 S.W.2d

---

**23.** For instance: *Glover v. Herald Company*, 549 S.W.2d 858 (Mo. banc 1977) cited by the news medium defendants for the general argument that the "*New York Times* and cases of that genre are applicable to the press in Missouri" decides only that as to a *public official* the *New York Times* privilege standard for liability still applies—a matter not relevant nor disputed by the implications of petition brought by a *private* individual.

*Williams v. KCMO Broadcasting Division, etc.*, 472 S.W.2d 1 (Mo.App.1971) was an action for invasion of privacy by one caught up in a mass arrest procedure—then transmitted to the public by television although he committed no crime. The case was decided on the principle of *public interest* and, implicitly, that the plaintiff became a *public figure* by involuntary involvement in a news event—standards later rejected altogether in *Gertz.* The numerous federal authorities cited [l.c. 4] have since been dated by *Gertz, Firestone* and *Wolston* —among other United States Supreme Court declarations.

*Laun v. Union Electric Co. of Missouri*, 350 Mo. 572, 166 S.W.2d 1065 (1942) was a defamation action, not against a news publisher, but against an employer for the alleged libel contained in a court suit pleading. The opinion dealt with the common law principles of absolute and qualified privilege as they appertained to a record in a judicial proceeding, and so is not relevant to the information which forms the basis of the negligence petition before us.

385 (Mo.1963)] and a public warning of crime by a prosecutor [*Woolbright v. Sun Communications, Inc.,* 480 S.W.2d 864 (Mo. 1972)] are matters of legitimate public concern under this principle and so conditionally privileged—absent bad faith. *Perdue v. Montgomery Ward,* 341 Mo. 252, 107 S.W.2d 12, 14[4–6] (1937). Whether the interest of a publisher is sufficiently important to give rise to a privilege to protect it against invasion by the publication of defamatory matter concerning another is akin to whether a duty arises to foresee and protect another against a risk of injury. In each the legal right derives from a preponderant value of the interests in competition. In the case of a defamatory publication [Restatement (Second) of Torts § 594 (1977)]:

> *Comment e*
>
> Whether an interest not given direct legal protection is *of sufficient importance to give rise to a privilege to protect it against invasion by the publication of defamatory matter concerning another depends upon a comparison of the advantages to the publisher's interest if the defamatory matter should be true, with the harm that will be done to the other's reputation if the defamatory matter should be false. Thus the value of the interest affected and the serious or trivial character of the defamatory imputation may be important factors in determining whether the interest is thus protected.* [emphasis added]

In the case of a negligent act—publication or otherwise [Restatement (Second) of Torts §§ 291, 292 and 293 (1965)]:

> *§ 291*
>
> Where an act is one which a reasonable man would recognize as involving a risk of harm to another, the risk is unreasonable and the act is negligent if the risk is of such magnitude as to outweigh what the law regards as the utility of the act or of the particular manner in which it is done.
>
> *§ 292*
>
> In determining what the law regards as the utility of the actor's conduct for the purpose of determining whether the actor is negligent, the following factors are important:
>
> > (a) the social value which the law attaches to the interest which is to be advanced or protected by the conduct; etc.
>
> *§ 293*
>
> In determining the magnitude of the risk for the purpose of determining whether the actor is negligent, the following factors are important:
>
> > (a) the social value which the law attaches to the interests which are imperiled, etc.

Just as the law does not extend privilege to protect a news medium against the defamatory or invasion of privacy publication of information of trivial public interest,[24] so

---

24. Restatement (Second) of Torts § 611 (1977) deals with the privilege which attends the publication of defamatory matter concerning another in the report of an official action—such as a police arrest. The basis of the privilege [comment a] is the interest of the public in information as to what occurs in official proceedings and public meetings. We have found that the name and address information of the victim while the identifiable assailant was still at large was not a public record either under the *Sunshine Law* or under the *common law.* Since the purpose of the privilege [comment i] "is to protect those who make available to the public information concerning *public events that concern or affect the public interest, ... the privilege does not extend to a report ... that does not deal with matters of public concern ....*" [emphasis added]

Restatement (Second of Torts § 652D (1977) deals with liability for the publicity invasion of the private life of another, *if the matter publicized is of a kind that*

"(a) would be highly offensive to a reasonable person, and

(b) *is not of legitimate concern to the public.* [emphasis added]

\*    \*    \*    \*    \*    \* ·

"[Comment] g. News.

Included within the scope of legitimate public concern are matters of the kind customarily regarded as 'news.' *To a considerable extent, in accordance with the mores of the community, the publishers and broadcasters have themselves defined the term,* as a glance at any morning paper will confirm, [emphasis added]

\*    \*    \*    \*    \*    \*

"*h. Private Facts.*

the law does not impose a duty of care to foresee an injury to another on a slight probability alone, but only on "some probability of sufficient moment to induce the reasonable mind to take precautions which would avoid it." *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52, 55[6, 7] (1952).

■ We have determined that the name and address of the victim-plaintiff prior to the arrest of the assailant was not an official report under the Sunshine Law and so was not a privileged publication under the tenor of that statute or the rules of the common law. That view accords with the rationale of our decisions, the statement of principle in Restatement (Second) of Torts § 611 (1977) and other sound authority. *Cianci v. New York Times Publishing Company*, 639 F.2d 54, 70 (2d Cir. 1980); *Lancour v. Herald & Globe Ass'n.*, 111 Vt. 371, 17 A.2d 253 (1941). We determine also that the name and address of an abduction witness who can identify an assailant still at large before arrest is a matter of such

Permissible publicity to information concerning either voluntary or involuntary public figures is not limited to the particular events that arouse the interest of the public. That interest, once aroused by the event, may legitimately extend, to some reasonable degree, to further information concerning the individual and to facts about him, which are not public and which, in the case of one who had not become a public figure, would be regarded as an invasion of his purely private life.

\* \* \* \* \* \*

"The extent of the authority to make public private facts is not, however, unlimited ... *In determining what is a matter of legitimate public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores.* The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he had no concern. The *limitations, in other words, are those of common decency, having due regard to the freedom of the press and its reasonable leeway to choose what it will tell the public, but also due regard to the feelings of the individual and the harm that will be done to him by the exposure.*" [emphasis added]

trivial public concern compared with the high probability of risk to the victim by their publication, that a news medium owes a duty in such circumstances to use reasonable care not to give likely occasion for a third party [assailant still at large] to do injury to the plaintiff by the publication. That duty derives as an "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Prosser, The Law of Torts, 325–6 (4th ed. 1971). It derives from a balance of interests between the public right to know and the individual right to personal security—between the social value of the right the press advances and the social value of the right of the individual at risk. Restatement (Second) of Torts §§ 291–293 (1965). It derives from the social consensus that common decency considers such information of insignificant public importance compared to the injury likely to be done by the exposure.[25] Restatement (Second) of Torts § 652D, comments *g* and *h* (1977). It de-

The petition under review, of course, attempts no cause of action for a defamatory invasion of privacy or outrageous conduct publication. The recovery proposed is for negligence. The nature of the public interest which favors the news medium publisher with a privilege, however, remains constant: that the matter published was of *a legitimate public concern.*

25. The "unwritten policy" [the news medium defendant concedes in the answers to interrogatories] not to print the name and address of a female victim of a reported male attempted or actual sexual assault is nothing more than a usual news medium practice in conformance with precepts of "common decency" and the discerned "mores of the community" Restatement (Second) of Torts § 652D, comments *h* and *g* (1977). The practice *"indicates a general belief that such information is actually of no legitimate public concern, and can seriously injure innocent persons who have already suffered grievously."* Publication of Facts—Victim of Sex Crime, 86 A.L.R.3d 80, 82; *State v. Evjue*, 253 Wis. 146, 33 N.W.2d 305 (1948); *Nappier v. Jefferson Standard Life Ins. Co.*, 322 F.2d 502 (4th Cir. 1963). A deviation from that industry standard, therefore, becomes *evidence* of negligence, and clarifies the cause of action the petition intends. *Hannah v. Mallinckrodt, Inc.*, 633 S.W.2d 723 (Mo. banc 1982) 1982. The news publication of the defendant Columbia Daily Tribune reports the victim to have said that the assailant made no effort to molest

rives from "the known character, past conduct and tendencies of the person [assailant] whose intentional conduct causes the harm, the temptation or opportunity which the situation [publication] may afford him for such misconduct, the gravity of the harm which may result." [*Scheibel v. Hillis*, 531 S.W.2d 285, 288[7, 8] (Mo. banc 1976)] Restatement (Second) of Torts 302B, comment *f* (1965)]—the likelihood in the

her. Our prior discussion has determined that the allegations of the petition enhanced by the interrogatory responses, taken at most favorable intendment, allow inference that, despite no actual molestation was offered before the victim escaped, the purpose of the abduction was for sexual purposes, among others.

The several defendants cite *Hood v. Naeter Brothers Publishing Co.*, 562 S.W.2d 770 (Mo. App.1978). That case was for the *outrageous conduct publication* of the name and address of the sole witness of a violent crime at a time when the criminals were still at large. The court held [l.c. 772] that such a publication "may be unwise but it does not go beyond the bounds of human decency"—and so denied recovery. The court then added, concededly as dictum, that "the published information was a matter of public record and readily available to all interested persons." The court cited no local statute or decision for that dictum, but rather adverted to a constitutional consideration, neither raised nor argued by the litigants—the effect of *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). *Cox*, as we noted, dealt with *judicial records*, not with any official action before arrest. *Cox* holds, compatibly with our own law [*Laun v. Union Electric Co. of Missouri*, 350 Mo. 572, 166 S.W.2d 1065, 1073[15, 16] (1942)] that the publication of judicial records is absolutely privileged. *Cox* holds no more than that publication of rape victim name information in a [judicial] record already open to the public does not give a basis for an invasion of privacy suit. That is because [*Cox*, l.c. 494, 95 S.Ct. 1045] "interests in privacy fade when the information involved already appears on the public record." Information already open to the public, of course, is also open to the press for publication. *Cox* has nothing to do with extra-judicial reports, such as a report of crime to the police *not* a public record so that facet of the *Hood* opinion is not only gratuitous but misplaced.

That the publication of the name of a witness to a crime while the criminals are still at large does not amount to outrageous conduct does not prove an analogy that such conduct was not negligent. *Hood* [l.c. 772] observed that the publication may have been "unwise." [imprudent? unreasonable? negligent?] We have treated—as have the defendants—the defamation, right of privacy and outrageous conduct torts alike for the sake of argument and to simplify decision. The development of these remedies, however, show a kinship between defamation and privacy which the outrageous conduct remedy simply does not share. The interest the defamation remedy protects is: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt [and] reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty." *Rosenblatt v. Baer*, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), l.c. 92, 86 S.Ct. 679, concurrence of Mr. Justice Stewart. The right to privacy attests to a value equally as basic: "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men"—[Mr. Justice Brandeis in dissent, *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928)]—later given constitutional stature in *Griswold v. Connecticut*, 381 U.S. 479 (1965). *See also Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). The outrageous conduct remedy, on the other hand, protects an interest more peripheral: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, *as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'*" [emphasis added] Restatement (Second) of Torts § 46, comment *d* (1965) cited as the basis for the tort and adopted as the law of Missouri in *Pretsky v. Southwestern Bell Telephone Co.*, 396 S.W.2d 566, 568[2] (Mo.1965) and followed in *Hood, supra.* The outrageous conduct tort remedy, therefore, protects hurt feelings—an interest lesser than the concern of a civilized society for personal reputation, privacy and security—and so, commensurately with the reality of organized life which expects each person to bear the rough language and inconsiderate conduct of others [Restatement (Second) of Torts § 46, comment *d* (1965): *Pretsky*, supra, l.c. 568; *Hood*, supra, l.c. 771] requires a greater proof to sustain recovery than any of the other three torts. To recover for an outrageous conduct tort the proof must be such that an average person would declare the conduct to be "Outrageous." To recover for negligence, as the petition pleads, an average person would declare the conduct only careless. *Hood* bears neither by analogy nor by legal analysis on the sufficiency of the averments of the petition as a valid and subsistent cause of action.

circumstances that the assailant still at large will threaten, attempt an intentional harm or a criminal obstruction of justice to prevent the victim from a confirmed identification and prosecution of the assailant. The petition does not contest the truth of the publication nor assail an unpopular opinion. It does not tend the medium to that course of self-censorship which offends a free press, but engenders an attitude of due care for the safety of one likely to be harmed from the reportage of trivial information. To delete the name and address of the abduction victim from the news medium publication [26] would impair no significant news function nor public interest in the reportage of crime and apprehension of criminals. To report that information when the assailant can be identified—as the news publication clearly informs—rather, encourages not only a likelihood of injury but of additional crime.

The petition of the victim-plaintiff taken at most favorable intendment states a cause of action in negligence against the news medium defendants free from the proof constraints of *New York Times v. Sullivan* as well as any constraints of common law privilege. *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164, 99 S.Ct. 2701, 2705, 61 L.Ed.2d 450 (1979); *Laun v. Union Electric Co. of Missouri*, 350 Mo. 572, 166 S.W.2d 1065, 1073[15, 16] (1942); Restatement (Second) of Torts § 580B comments *d* to *f* (1977).

The municipal defendant contends finally that—a legal duty to the plaintiff and a breach of that duty assumed—nevertheless the petition does not allege a physical injury and so does not state a cause of action in negligence. The argument goes that "absent physical injury or malicious, wilfull, wanton and inhuman conduct" our law does not permit recovery for mental distress—the only injury the petition pleads.[27]

The petition is in negligence. It is the likelihood of injury to another that gives rise to the duty to exercise due care. The test of negligence liability is foreseeability: that the actor knows or has reason to foresee that the act involves an unreasonable risk of injury to another but fails to protect against that hazard. *Mrazek v. Terminal R. Assn. of St. Louis*, 341 Mo. 1054, 111 S.W.2d 26, 29[5–7] (1939); Restatement (Second) of Torts § 284(a) (1965). Negligence liability results therefore when a breach of duty causes damage. The duty is not to protect against every possible injury which might follow upon the conduct, however, but only from a reasonably fore-

---

**26.** KIDNAPPED WOMAN ESCAPES FROM HER ABDUCTOR'S CAR

By NATE BROWN of the Tribune's staff

A 24-year-old Columbia woman told police she was abducted at gunpoint early this morning, but escaped from her kidnapper's car a few blocks away.

Sandra Kay Hyde, 4334 Bethany Drive, told police the man who forced her into his car told her: "You will do what I want you to do, or I will blow your brains out."

She told police she was walking on the north side of Broadway near Fifth Street when a late-model Mustang pulled up to the curb. A lone man inside opened the passenger door, pointed a sawed-off shotgun at her and ordered her into the car.

The man kept the shotgun pointed at her as they headed west on Broadway, she said. Her chance to escape came when her abductor looked away as he turned the car north onto Garth Avenue.

The man grabbed her dress as she fell out of the car, she said, but she was able to escape anyway and run east on Broadway to the By George Disco, where she called police at 12:35 a. m.

Hyde said she saw the man driving on First Street when she reached the disco, and one more time in the area while she awaited an officer's arrival.

The man did not assault or try to molest her while she was in the car, she told police.

She described her kidnapper as 6 feet tall, weighing more than 200 pounds, having a heavy build, red bushy hair and a full red beard and mustache. The car was a red, late-model Ford Mustang.

**27.** "Plaintiff has suffered nervous and physical shock and mental anguish and is unable to be alone, all as a direct and proximate cause of Defendants' actions and continues to be fearful, anxious, nervous and lives in a constant state of nervous tension." The petition then seeks—compatibly with the *Gertz* constitutional standard which prohibits a punitive damage award even to a private individual in the absence of a pleading and proof of actual malice—only *actual damages*.

seeable danger. *Schlegel v. Knoll*, 427 S.W.2d 480, 484[8, 9] (Mo.1968). Our law holds to the view that a reasonable actor under a duty of care to another does not foresee mental distress unconnected with physical injury as a consequence of a breach of that duty. *Brisboise v. Kansas City Public Service Co.*, 303 S.W.2d 619, 626[3] (Mo. banc 1957); *Bass v. Nooney Company* (Mo.App.E.D. No. 42989 adopted February 2, 1982). The rationale for that rule of damages rests on the fundamental premise that [contradistinctively from torts intentionally inflicted] "it is unreasonable to hold persons who are merely negligent bound to anticipate and guard against fright and consequences of fright." *Crutcher v. Cleveland C., C. & St.L.R.R.*, 132 Mo.App. 311, 111 S.W. 891, 893 (1908). That rationale rests the recovery of damage on the distinction between conduct only negligent [*McCardle v. George B. Peck Dry Goods Co.*, 271 Mo. 111, 195 S.W. 1034, 1036 (1917)] and conduct actuated by a state of mind [*Trigg v. St. Louis, K. C. & N. Ry. Co.*, 74 Mo. 147, 153 (1881)]. Prosser, The Law of Torts § 31, 145 (4th ed. 1971):

> "Negligence is conduct, and not a state of mind." ... The standard imposed by society is an external one, which is not necessarily based upon any moral fault of the individual; and a failure to conform to it is negligence, even though it may be due to stupidity, forgetfulness, an excitable temperament, or even sheer ignorance. The almost universal use of the phrase "due care" to describe conduct which is not negligent, should not be permitted to obscure the fact that *the real basis of negligence is* not carelessness, but *behavior which should be recognized as involving unreasonable danger to others* ... In negligence, the actor does not desire to bring about the consequences which follow, nor does he know that they are substantially certain to occur, or believe that they will. There is merely a risk of such consequences, sufficiently great to lead a reasonable man in his position to anticipate them, and to guard against them. If an automobile driver runs down a man in the street before

him, with the desire to hit him, or with the belief that he is certain to do so, it is an intentional battery; but if he has no such desire or belief, but merely acts unreasonably in failing to guard against a risk which he should appreciate, it is negligence. [emphasis supplied]

The rule of damages rests on at least the reason, therefore, that mental distress is a less probable consequence of negligent conduct and a more certain consequence of intentional conduct. Thus in the absence of an *independent basis for tort liability for mental distress as a foreseeable element of the duty*, a negligent actor has no liability—under our decisions—for mental injury unrelated to a physical injury.

Our law imposes *liability in negligence for an intentional injury* where the original actor creates a condition which he knows or should foresee will give occasion to a third person to commit an intentional injury upon the plaintiff. *Scheibel v. Hillis*, 531 S.W.2d 285, 288[7, 8] (Mo. banc 1976); *Zuber v. Clarkson Construction Co.*, 363 Mo. 352, 251 S.W.2d 52, 55[6, 7] (Mo.1952); Restatement (Second) of Torts §§ 302B and 449 (1965). In such case, the injury from the intentional tort—because foreseeable at the time of the original conduct—becomes a component of the original foreseeable risk of injury and so a compensable damage in the negligence recovery. *Price v. Seidler*, 408 S.W.2d 815, 821[8–10] (Mo.1966); Restatement (Second) of Torts § 448 (1965); Prosser, The Law of Torts § 44 (4th ed. 1971). That is so whether the subsequent intentional misconduct concurs or even independently intervenes to combine with the negligent conduct of the original actor. *Christiansen v. St. Louis Public Service Co.*, 333 Mo. 408, 62 S.W.2d 828, 830[1] (1933); *Dickerson v. St. Louis Public Service Co.*, 365 Mo. 738, 286 S.W.2d 820, 824[3–5] (banc 1956); *Price v. Seidler*, 408 S.W.2d 815, 821[8–10] (Mo.1966). If the conduct of the original actor was a *substantial factor* to bring about the harm, that the injury was inflicted by a subsequent independent act even of the quality of a crime or an intentional tort does not relieve the original ac-

tor for *liability in negligence.* *Scheibel v. Hillis,* 531 S.W.2d 285, 288[7–9] (Mo. banc 1976); Prosser, The Law of Torts § 44, 270 (4th ed. 1971); 1 Dooley, Modern Tort Law § 3.12 (1977).

■ We have determined that the petition enhanced by the facts of discovery, at best intendment, pleads a cause of action against the several defendants in negligence for the intentional infliction of injury upon the victim-plaintiff by the third-person assailant. These pleadings and facts of discovery, at best intendment, allow inference that the past conduct, reported character and tendency of the third-person assailant to violence, were known or reasonably knowable to the several defendants so that it was reasonably foreseeable that the publication of the name and address of the victim, while the assailant was still at large, was a temptation to that third person to inflict an intentional harm upon the victim-plaintiff—a foreseeable risk the several defendants had a duty to prevent. *Scheibel v. Hillis,* 531 S.W.2d 285, 288[7–9] (Mo. banc 1976); Restatement (Second) of Torts § 302B, comment *f* (1965). The facts of the petition describe conduct by the third-person assailant upon the victim equivalent to a criminal obstruction of justice or a civil intentional assault tort. That species of tort involves an invasion of personal integrity. Restatement (Second) of Torts § 21 (1965). It amounts to an unlawful *offer or attempt to injure another so no actual physical contact is necessary to complete that intentional tort.* *Adler v. Ewing,* 347 S.W.2d 396, 402[12–17] (Mo.App.1961). Thus, the tort protects a plaintiff against a purely *mental* disturbance. Prosser, The Law of Torts § 10 (4th ed. 1971). That the petition pleads a mental distress injury inflicted on the victim-plaintiff by the intentional independent tort of the third-party assailant does not render the original breach of duty of the several defendants to protect against that foreseeable conduct any less negligent nor the mental distress injury beyond the recovery the negligence petition pleads.

The judgment of dismissal is reversed and remanded with directions to the trial court to reinstate the petition against the defendants on appeal.

All concur.